### AND

## THE CORRECTION OF ERRORS,

### OF THE

## STATE OF NEW-YORK,

### IN FEBRUARY AND MARCH, 1811.

---

| | | |
|---|---|---|
| DANIEL FRIER and PETER COOPER *against* | } *Plaintiff in error.* | |
| JAMES JACKSON *ex dem.* JOHANNIS L. VAN ALLEN and JOHN J. VAN ALLEN, | } *Defendant in error.* | |

IN ERROR.
.....
ALBANY,
Feb. & March,
1811.

FRIER
v.
JACKSON.

---

THE defendant in error brought an action of ejectment, in the supreme court, on the demise of *Johannis L. Van Allen* and *John J. Van Allen*, to recover of the plaintiffs

*The death of the lessors of the plaintiff, in an action of ejectment, be-fore the trial, does not abate the suit.*

A bill of exceptions, does not draw the whole matter into examination, but only the points to which it is taken, and the party must lay his finger on the points which arise either in admitting or refusing evidence, or matter of law, arising from a fact not denied, in which he is overruled by the court.

The construction of a grant is matter of law; but its legal effect, deducible from its terms or matter subsequent, which by showing the sense of the parties, may authorize a larger or narrower construction, so as to include or exclude the premises in controversy, is a matter of fact for a jury only to decide.

The true construction of. *De Bruyn's* patent is a line from *David's Hook* to the *Saw-kill*, drawn between those two points, along the east shore of the *Hudson's* river, to compose the *western* boundary ; a line along the west bank of the *Fish-lake*, in its whole extent, the *eastern* boundary ; and straight lines from the extremities of the *Fish-lake*, to the stations on the *Hudson* or *David's Hook* and the *Saw-kill*, the *northern* and *southern* boundaries.

The patent to *Baker* and *Flodder*, in 1667, is not void, for uncertainty.

IN ERROR.
.....
ALBANY,
Feb. & March,
1811

FRIER
v.
JACKSON.

in error, the possession of a grist-mill, saw-mill, and lands thereto adjoining, situate in the town of *Kinder-hook*, in the county of *Columbia*.

The cause was tried at a circuit court held in and for the county of *Columbia*, in *July*, 1806, before his honour, *Daniel D. Tompkins*, Esq. then one of the justices of the supreme court, when a verdict was found for the plaintiff below, in conformity to the opinion of the judge, as expressed in his charge to the jury. To this charge, the counsel for the defendants below took a bill of exceptions. Judgment having been rendered in the supreme court, on the verdict, the defendants below brought a writ of error returnable to this court.

The plaintiff below derived title to his lessors, in a tract of land, granted by letters patent, to *John Hendrixe De Bruyn*, dated the    day of *December*, 1686, in the second year of the reign of King *James* II. This patent, after reciting an *Indian* deed, dated in 1668, grants, as follows :

" A certain piece or tract of land, lying on the east side of *Hudson's* river, or the river of *New Albany*, beginning from *Davidson's* creek, which creek lies against *Bear Island*, called in the *Indian* tongue, *Pahssapaen-penock*, and from said creek, stretching southerly, along the river to the Saw-kill of *Frans Peterse Claver*, the creek in the *Indian* tongue called *Petteenock*, stretching to the east, and in the woods, to the first two lakes or in-waters, which are called by the *Indian Hithook* and *Wawagewashook*."

The plaintiff gave in evidence, 1. A deed from *De Bruyn*, the patentee, to *Lawrence Van Allen*, dated 23d *September*, 1707, in fee, for the consideration of 400 pounds.

2. The will of *Lawrence Van Allen*, dated 4th *March*, 1712-13, under the residuary clause of which, all his real estate (not before specially devised) was devised to his nine children, as tenants in common, in fee, viz.

*Johannis*, *Evert*, *Peter*, *Stephanus*, *Luycas*, and *Jacobus Van Allen*; *Catharine*, the wife of *Mulgert Malgertse Van Derpool*; *Janite*, the wife of *Lendert Phi'ipsie Conine*; and *Christiana*, the wife of *Johannis Van Deusen*.

3. The will of *Evert Van Allen*, dated 16th *Sept.* 1719, devising all the right and title which he acquired under his father's will, to his brother *Luycas Van Allen*.

4. A deed, in consideration of natural love and affection, from *Johannis Van Deusen* and his wife to *Luycas Van Allen*, for the ninth part of the estate devised by their father.

5. The plaintiff next proved that *Luycas Van Allen*, the son of *Lawrance*, the elder, died prior to the revolutionary war, leaving two sons, *Lawrance* and *John*, and that *Lawrance*, the eldest, was now living.

6. A lease, bearing date the 24th of *March*, 1800, from *Lawrance* and others, to the lessors of the plaintiff, for twenty-one years, to enable them to bring suits at law to recover the premises therein described, as follows, to wit: " A certain tract or tracts, piece or pieces of land, situate on both sides of the run of water, called *Valletje's Kill*, together with the said run of water and lands thereby covered; and being parcel of a patent, commonly called *De Bruyn's* patent, situate," &c.

7. The will of *Jacobus Van Allen*, (the son of *Lawrance* the elder,) dated 14th of *October*, 1754, by which he devised all his real estate to his three sons, *Lawrance*, *Johannis*, and *Abraham*. *Abraham* died without issue; his eldest brother, *Lawrance*, was his heir at law. *Johannis* died, leaving *John J. Van Allen*, (one of the lessors of the plaintiffs,) his eldest son and heir, who, as heir of his father, claimed one third of one ninth. The said lessor died in 1805, leaving a brother and sister, his heirs at law. *Lawrance*, (the son of *Jacobus*, the son of *Lawrance Van Allen* the elder,) by his will, bearing date the 19th of *June*, 1790, devised all his real estate to his

IN ERROR.
.....
ALBANY,
Feb. & March,
1811.

FRIER
v.
JACKSON.

IN ERROR.
.....
ALBANY,
Feb. & March,
1811.

FRIER
v.
JACKSON.

widow, *Jane Van Allen*, who was a party to the lease, dated 24th of *March*, 1800.

The two shares of *Evert* and *Catharine*, the plaintiff contended, were united in *Luycas* their brother, with his ninth, and that these three ninths descended to *Lawrance*, his eldest son, who, in *March*, 1800, made the lease, for the purpose of bringing this suit. The lessors claimed these three ninths, together with one ninth, the original share of *Jacobus*, (the son of *Lawrance* the elder.) This last-mentioned ninth, they claimed under the same lease, executed by *Jane Van Allen*, who derived her title (an estate during widowhood) under the will of her husband, dated in 1790.

*Johannis L. Van Allen*, the other lessor of the plaintiff, died in 1804.

8. A map of the patent, made by *John E. Van Allen*, was produced and proved, exhibiting the location thereof, according to the construction contended for by the plaintiff below, that is the river between *Davidson's* creek and the *Saw-kill*, is represented as the base, and upon that base, the body of land stretches east until its extent is terminated by the lakes. It was proved, that upon this construction, the premises in question are included within the patent; and that if the northern boundary of the patent be run from the mouth of *Frans Peterse's Saw-kill* to the southern extremity of the lakes, the premises would also be included. But if the said southern boundary be run from the mouth of the said kill to the nearest point of the lakes, the premises in question are excluded; and that lines run from the two stations upon the river east, until a north and south line would strike the west side of the lake or lakes, would also exclude the premises.

As early as the year 1720, a survey and map was made of the patent to *De Bruyn*, by *Philip Ver Planck*, a surveyor of eminence at that day, in conformity to the construction adopted by the plaintiff below; the

IN ERROR.
.....
ALBANY,
1811.
FRIER
v.
JACKSON.

north and south boundary lines running east, and the lakes being the eastern extent of the patent. At the same time, a partial division was made by the said *Philip Ver Planck*, of lands on the eastern extent of the patents ; and the proprietors being then nine in number, one lot was assigned to each, and conveyed by them to each other, in severalty, and so held ever since.

In the year 1751, the patent was surveyed by *I. R. Bleecker*, and a division was made of another portion of the said patent by him ; and, as it was contended by the plaintiff, upon the same principle of construction with *Ver Planck's* survey ; and on that division several lots, to wit, No. 8. 17. 30. and 31. lying in the disputed lines, were laid out adjoining to the south boundary line of the patent. This last-mentioned division was confirmed by an act of the legislature of this state, passed the 4th day of *February*, 1793, which contained a proviso that nothing therein should affect the rights of any person or persons, except those claiming under *Lawrance Van Allen*.

It was also proved, on the trial, that the boundaries of the patent to *De Bruyn* had been known, and actual possessions and improvements made under it, throughout every part of the same, and particularly along almost the whole extent of the north and south boundary lines, as far back as the memory of man reached ; and that such possessions and improvements have been uninterruptedly held and enjoyed accordingly, to the time of trial.

In further confirmation of the principle of location contended for by the plaintiff below, he produced letters patent to *Burger Huyck* and others, dated the 6th day of *October*, 1731, the boundaries whereof are described as follows :

" A certain tract of land situate, lying and being in the county of *Albany*, on both sides of the *Kinderhook* creek or river, beginning at a small black oak tree,

*IN ERROR.*

ALBANY,
Feb. & March,
1811

FRIER
v.
JACKSON.

marked with three notches, and standing on the brow of the falling off hills, near the south end of the land granted to *Dirck Wessels* and *Garret Teunisse,* and on the west side of the *Kinderhook* creek or river, and on the south side of a small run of water, running down the said hills, which tract runs from the said black oak tree, north 60 deg. west 95 chains, then north 5 deg. east 40 chains, to the easterly bounds of a tract of land granted to *Jan Hendrixe De Bruyn;* then along his bounds north 27 deg. east 93 chains, to a large fish pond; then south-easterly; and northerly along the south and east sides of the said pond to," &c.

By the testimony of *John E. Van Allen* it was proved, that he had never surveyed the latter patent, with any reference to the former, but that he run the east line of *De Bruyn's* patent, as claimed by them in 1793. Its course was then north 9 deg. 15 min. east. The description of the east line of *Huyck's* patent was north, 27 deg. east, and if the allowance of the variation of the compass were made, it would cause those lines to diverge still more. The distance from the south-east corner of *De Bruyn's* patent, as shown, to the lake, was 100 chains, 58 links, and that from the south-west corner of *Huyck's* patent to the lake, was 93 chains. The witness did not know that he had ever run the south line of *Huyck's* patent, nor could he speak with any certainty as to the effect of the lines of *Huyck's* patent upon *De Bruyn's,* but from his general knowledge of the country, he believed the southern line of *Huyck's* patent would strike near the south-east corner of *De Bruyn's* patent; but of this he had no knowledge by actual survey.

The plaintiff also produced letters patent to the free-holders and inhabitants of *Kinderhook,* bearing date the 14th day of *March,* 1686, in the third year of King *James* the second, for a tract of land, thus described: " All that tract or parcel of land that lieth on the east

side of *Hudson's* river, beginning at a place called
*Swarte Hook*, and runs north upon said river four *En-
glish* miles to a certain place called *David's Hook;* and
then runs east into the woods, keeping the same breadth
to the land of *Dirck Wessels* and *Garret Teunisse* and
the high hills, eight *English* miles ; and then south
to the fall of Major *Abrahams*." This patent distin-
guishes between such " parcels as had been in anywise
taken up, divid d, allotted, settled and appropriated,"
and the remainder not yet " taken up or appropriated."
The parcels of the former description are granted to 28
of the proprietors, by name, (*De Bruyn*, being one of
them,) " and to their several and respective heirs and
assigns." The remainder is granted to 31 persons, in-
cluding the 28 before mentioned, and to their heirs, suc-
cessors and assigns, to be divided according to the acts,
concessions and agreements of the inhabitants, at their
town meetings.

A survey and map of partition of the last-mentioned
patent was made, in the year 1762, by *Hermanus Wen-
dell*, *Garrit Van Den Bergh* and *Isaac Vrooman*, com-
missioners, appointed in pursuance of the acts in that
case made and provided, which map was filed in the
clerk's office of the city and county of *Albany ;* on which
partition, the whole of said patent to the freeholders
and inhabitants of *Kinderhook*, which had not been
theretofore appropriated, was laid out in lots ; and the
patent to *Jan Hendrixe De Bruyn* is on the said map
of division, which the counsel for the plaintiff contended
is recognised within the same boundaries, and on the
same principle of location as always claimed by the pro-
prietors thereof.

Witnesses were also sworn, to show, that the
boundary line between *De Bruyn's* patent and the pa-
tent to *Kinderhook*, being the south boundary line of
*De Bruyn's* patent, has always, since the said parti-

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1811.

FRIER
v.
JACKSON.

IN ERROR.
.....
ALBANY,
Feb. & March,
1811.

FRIER
v.
JACKSON.

tion, in 1762, been held and possessed in conformity to the recognition thereof, in the said partition.

It was admitted that the lessors of the plaintiff were both dead : one of them died about two years, and the other about one year, before the time of the trial ; but their lease to the plaintiff was yet unexpired.

The defendants below contended, that the premises in question were included within the bounds of an older patent, granted to Captain *John Baker* and *Jacob Janse Flodder*, in 1667, the boundaries of which were as follows : " A certain parcel of bush land near *Fort Albany*, together with the creek or kill, with the fall of waters, running north and south, lying and being upon the north side of the *Emiques'* land, at *Kinderhook*, and on the west side of the great kill, containing by estimation —————— acres of land. The deed of purchase from the said *Indians*, bearing date, at *Fort Albany*, *March* 18, 1666." By the *Indian* deed to the above named patentees, the *Indians*, in consideration of one blanket, one axe, three hoes, two bars of lead, three handsful of powder, one knife and one kettle, conveyed " all that bush land and kill and fall, running north and south, lying and being upon the north side of the *Emiques'* land, at *Kinderhook*, and on the north side of the great kill." This deed was filed in the secretary's office, in *February*, 1667.

The defendants proved the death of *Flodder*, the patentee, leaving *John Jacobse Gardinier*, his eldest son, and heir at law, who died, leaving *Jacob Gardinier*, his eldest son and heir at law. They also produced a deed from *Jacob Gardinier* to *Edward Wheeler*, dated *June* 1, 1710 ; in which the premises conveyed are thus described : " A certain creek called *Vallatje's Kill*, with a saw-mill and a grist-mill standing thereon, in the county aforesaid, behind *Kinderhook*, with all the land and wood belonging thereto, so as the same is now possessed by the said *Edward Wheeler*, according to a

4

patent granted by Governor *Richard Nichols*, in the
year 1667, on the 13th of *April:* and also according to a
deed of the 18th *March*, 1666, and referred to in the
aforesaid patent to *John Baker* and *Jacob Janse Flod-der*."

IN ERROR.
.....
ALBANY,
Feb. & March,
1811.

FRIER
v.
JACKSON.

They next produced a deed from *Edward Wheeler* to
*Evert Wheeler*, dated 5th *January*, 1739, for the north
part of the tract granted to *Flodder* and *Baker*, and de-
scribed as lying upon the *Vallatje's Kill*, beginning where
the *Bollegat sprout* or *branch* empties into said kill,
thence going up said creek, and taking in all the lands
and woodlands, east and west, as far as the said *Edward
Wheeler's* right extended, to the uppermost part of the
pine plains; also, a deed for the same part, from *Evert
Wheeler* to *Peter Deyo*, dated 27th *October*, 1766, for the
consideration of forty pounds. They then proved the
death of *Edward Wheeler*, leaving *Robert*, his eldest son
and heir; and produced a deed from *William Wheeler* to
*Peter Deyo*, dated 7th *May*, 1766, for the residue of
the patent to *Flodder* and *Baker*, for the consideration of
ten pounds. These deeds to *Deyo* contained full cove-
nants of seisin and warranty. The defendant also pro-
duced a deed from *Peter Deyo* to *Daniel Frier*, one of
the defendants in the court below, for a lot of 400 acres,
including the premises in question, for the consideration
of 400 pounds.

The counsel for the defendants then attempted to show,
by the testimony of witnesses, many of whom were very
aged, the ancient possessions and reputed boundaries of
*Flodder* and *Baker's* patent; the whole of which evidence
was detailed in the bill of exceptions, but which it is un-
necessary to state here.

The counsel for the defendants insisted, at the trial,
that upon this evidence, the plaintiff was not entitled to
recover,

1. Because, both of the lessors of the plaintiff were
dead, and the title was, at the time of the trial, in their

*IN ERROR.*
ALBANY,
Feb. & March,
1811.

FRIER
*v.*
JACKSON.

heirs at law, and, consequently, could not entitle the plaintiff to recover seisin and possession of the premises in dispute.

2. Because, upon a just construction and location of the patent to *Jan Hendrixe De Bruyn,* under which the plaintiff claimed, the premises in question could not be included.

3. Because, by a correct construction and location of the patent to *John Baker* and *Jacob Janse Flodder,* the premises in question would be covered by that grant, which being older than the one under which the plaintiff claimed, must first be satisfied.

4. Because, the possession of the defendants, and those under whom they claim, have been exercised for such a period, as to toll the right of entry of the lessors of the plaintiff, if any such right in them had ever existed.

But the counsel for the plaintiff insisted, that upon the evidence offered, the plaintiff was entitled to recover,

1. Because *James Jackson* was the plaintiff in this action, and the death of his lessors could not prevent his recovery.

2. That the patent of *John Baker* and *Jacob Janse Flodder* did not cover the premises.

3. That it was not capable of any location whatever.

4. If, at the date of it, any actual possession was acquired under it, although it might protect any such cotemporaneous possession, it could not, at this late date, be so located, as to embrace any thing more.

5. The patent to *John Hendrixe De Bruyn,* under which the plaintiff claims, upon a just construction and location, included the premises in question; and,

6. No adverse possession is proved sufficient to toll the right of entry of the lessors of the plaintiff.

The judge delivered his opinion to the jury, as follows :
" The motion for a *nonsuit,* for the death of the lessors

of the plaintiff, is overruled. Such death cannot af-
fect the plaintiff's right of recovery ; at least, it cannot
be taken advantage of at *nisi prius.* The first ques-
tion arises upon the location of the patent to *De
Bruyn.* That is a question of law, unless the patent
is ambiguous. In my opinion, it is not ambiguous,
and the construction contended for by the plaintiff is
correct. The term *stretching* is to apply to the whole
tract of land, and not to the lines, or any of them. The
whole tract is to stretch east, in the manner laid down
upon the plaintiff's maps.

*IN ERROR.*

*AlBANY,*
*Feb. & March,*
*1811.*

*FRIER*
*v.*
*JACKSON.*

" The construction of this grant being matter of law, is
disposed of by the court ; and I shall only leave it to the
jury to determine, whether any acts of the parties, or
acts of the government, have varied from the construc-
tion ; for if they have not, the plaintiff is entitled to the
verdict.

" The defence set up is double. First, under the pa-
tent to *Baker* and *Flodder.* This patent, supported only
by the evidence now offered, is void, and incapable of
location. It has no bounds to the east, west, or north, nor
does its south boundary necessarily extend from east to
west, the whole extent of the *Emiques'* land, and nothing
more can be protected by it, than what has been so long.
held under it, that no other patent covering it can take it
away.

" If my construction is correct, and the premises are
in *De Bruyn's* patent, the question is narrowed down to
the mere adverse possession of the premises in question.
The question as to the extent of possession, and con-
nection between the several possessors of the premises in
question, is left to the jury. If they find an adverse pos-
session of the premises in question, held by the defendants
and those under whom they claim, in regular connection,
continued for 27 years and five months, prior to the com-
mencement of this suit, then they must find a verdict for
the defendants; otherwise, for the plaintiff. An adverse

*IN ERROR.*
ALBANY,
Feb. & March,
1811.

FRIER
v.
JACKSON.

possession from the year 1774 to the present time, will not protect the defendants.

" The possessions of *Robert Wheeler* are not to be regarded as permanent adverse possessions; they were probably intended as temporary, for the purposes of hunting, fishing, or cutting timber, without any design to claim the land.

" The deduction of title, made by the defendant, will not support the idea of adverse possession."

With these observations, the judge left the cause to the jury, who found a verdict for the plaintiff.

The cause was argued by *Sudam* and *E. Williams*, for the plaintiffs in error, and by *Van Buren* and *Van Vechten*, for the defendant in error; but the argument is omitted, as it would not be well understood, without a reference to the maps and diagrams which were produced.

THE CHANCELLOR. The bill of exceptions was taken to the opinion of the judge on four points.

1. Because both the lessors of the plaintiff are dead; and on this the defendants grounded their motion for a nonsuit, which the judge overruled.

2. Because, upon a just construction and location of the patent to *Jan Hendrixe De Bruyn*, the premises in question could not be included; but the judge determined that the premises in question were covered by it.

3. Because, by a correct construction and location of the patent to *John Baker* and *Jacob Janse Flodder*, the premises in question were covered by that grant, which, being older than the one under which the plaintiff claimed, must be first satisfied. But the judge determined that the patent of *Baker* and *Flodder*, *supported only by the evidence offered*, was void, and incapable of location.

IN ERROR.

ALBANY,
Feb. & March,
1811.

FRIER
v
JACKSON.

4. Because the possessions of the defendants, and those under whom they claim, have existed for such a period, as to toll the right of entry of the lessors of the plaintiff, if any such right in the land ever existed. But the judge charged the jury, that if they found an adverse possession of the premises in question held by the defendants, and those under whom they claim in regular connection, continued for 27 years and 5 months prior to the commencement of the suit, that then they should find for the defendants; otherwise, for the plaintiff.

These points have been precisely stated in the court below, by the defendants in that court and the plaintiffs here, as reasons against maintaining the action; and on those points, *in exclusion of all others*, the opinion of this court is required.

1. As to the first point. That the death of a lessor does not abate a suit in ejectment, has long been the settled doctrine. The action is considered as a legal fiction, devised to subserve the purposes of justice, and to be modelled, as those purposes require; and so far has this doctrine been carried, in advancement of justice, that even where the lessor was a tenant for life, his death was not permitted to abate the suit, which, it was held, might still be prosecuted, for the damages and costs. (2 *Str.* 1056. *Jenk.* 293. pl. 38. 1 *Bac. Abr.* 13. *Vin. Eject.* (T.) pl. 4.)

2. As to the second point. In the case of *Van Gorden* v. *Jackson*, (5 *Johns. Rep.* 467.) I said, that a bill of exceptions was given by statute, not to draw the whole matter into examination, but only on the points to which it was taken; and that the party excepting, must lay his finger on those points, which might arise either *in admitting or denying evidence* or matter of law, arising from *a fact not denied*, in which either party was overruled by the court. (2 *Bac. Abr.* 529. *Bill of Exceptions,* and the cases there cited. 2 *Caines,* 169.)

IN ERROR.
· ···
ALBANY,
Feb. & March,
1811.

FRIER
v.
JACKSON.

The case on which this court is now required to decide, affords a striking illustration of the utility of this doctrine; for if the court is to pursue the counsel, in the line of their discussion, they must, after deciding on the law, examine the evidence, weigh the relative credibility of the witnesses, and determine on the existence of facts, to the total subversion of one of the most salutary maxims of our law, that to questions of fact the jury are to respond; to questions of law the judges.

The second point relates to the construction of the patent to *Jan Hendrixe De Bruyn.* The construction of a grant is matter of law. Its legal effect is only deducible from its terms, according to the intent at the time of making it; (3 *Bac. Abr.* 393.) and matter subsequent, which, by showing the sense of parties, may authorize a jury to give a more liberal or restricted construction to it, as deduced from such matter, is exclusively in the province of the jury. It applies with equal force, whether the terms in which the grant is conceived are certain or ambiguous; for both require extrinsic aid to give them effect, which aid it is not in the power of the court to afford. Thus, if the place from which the description commences, is a *lake*, and the place to which it is to proceed, a *brook*, the court would restrain the parties from taking a rock for the one, or a mountain for the other; but which was the particular lake or brook intended, must necessarily be left to the jury.

The patent to *De Bruyn*, dated in *December*, 1686, requires it to stretch from *David's Hook*, southerly, along the river to the *Saw-kill* of *Frans Peterse Claver*, stretching to the east, and into the woods to the two first lakes.

Respecting the two stations on *Hudson's* river, *David's Hook*, and the *Saw-kill*, there is no contention; and no construction has been suggested, as a substitute, for carrying the eastern extent of *De Bruyn's* patent to the *Fish Lake*. The first reach, or stretch from one sta-

IN ERROR.

.....

ALBANY,
Feb. & March,
1811.

tion to the other, on the *Hudson*, has no latitude, and no direction, but along the river. This, therefore, could only have been a line along its shore, bending with, and corresponding to its inflections, from one point to the other.

The next stretch is to the east, and a single line in that direction covers no land; it could not possibly touch the two lakes, as they are described in the patent, or the two expansions of the *Fish Lake;* and it gives no closing lines; for if a single line is to be run east, it is absolutely necessary to supply others, if the lake is not coextensive with the distance between the two stations on the *Hudson*, from the termination of the east line to and along the lake, and from thence a closing line to *David's Hook.* There are no terms in the grant which can possibly supply these lines, if lines only are assumed, as the means of description; and I know of no legal principle, which will afford a ground for so subtending those lines.

In giving my opinion, in the case of *Van Gorden* v. *Jackson,* (*5 Johns. Rep.* 462.) I said, that the word *stretching*, in its common use in grants, during the early periods of the *English* colonial government here, was applied either to the extent of a single line, or to a rolling location, in which the breadth being described by lines or surfaces, was carried, with such breadth, to the object described at its *terminus.* This I still think correct, when applied either to a line, or to a rolling patent, not limited in its lateral extension, after departing from its base.

The patent of *De Bruyn* has no extent eastward from the river, unless the rolling construction is applied. It is to stretch east, and into the woods, to the first two lakes. No other lakes having been shown, to which the description can apply, the *Fish Lake*, which, from its conformation, was probably considered as composing two distinct lakes, and respecting which there has not been

IN ERROR.
.....
ALBANY,
Feb. & March,
1811.

FRIER
v.
JACKSON.

much contention, must be taken to be the lakes intended in the patent. The space between the two points on the river, are admitted to be at a greater distance from each other than the northern and southern extremities of the lake.

It does not require a square or a parallelogram to satisfy the terms of this patent. If, as far as respected its lateral extent, it was to have been located in unlimited space, and the lake had been of as great or greater extent than that between the two points on the *Hudson,* its breadth, to satisfy the terms of the patent, ought to be carried without variation throughout; but its lateral eastern extension must unavoidably be contracted by circumstances. Thus, if the terms had been, stretching to the east, to a tree accurately described, so as not to admit a doubt of the tree intended standing on the west bank of the *Fish Lake;* these terms, construed according to the settled law, uniformly applied to all the grants of the crown, that they shall receive a construction most beneficial to its interests, would have imposed a construction, that two lines, drawn from the given stations on the *Hudson* to such tree, so as to make it the vertex of the triangle, included the land intended to be granted; and if, instead of a *tree,* a *lake* (as in this case) was given, as a boundary, of less extent than the space between the two stations on the *Hudson,* the construction, on the same principle, must be, that all the land lying between the *Hudson* and the lake, and straight lines drawn from the extremities of the latter to the stations on the *Hudson,* was included by that description. If this rule was not to be applied, the extension of the whole breadth to the point, at which it first touched the lake, would equally satisfy the terms of the patent, with the construction which I deem the correct one.

My construction of the patent, deduced from these considerations, is, that the line from *David's Hook* to

IN ERROR.

ALBANY,
Feb. & March,
1811.

FRIER
v.
JACKSON.

the *Saw-kill*, is to be drawn between those points, along the east shore of the *Hudson*, and composes the western boundary; a line along the west shore of the *Fish Lake*, in its whole extent, the eastern boundary; and straight lines from the extremities of the lake, to the stations on the *Hudson*, *David's Hook*, and the *Saw-kill*, the northern and southern boundaries. This construction satisfies all the terms of the patent.

The direction of the extent from the river is positively east. As applied to the space on the *Hudson* and on the lakes, the diagrams of the parties united in showing that the direction was accurately described. The outlines, however, on the given construction, do not comport with an east course. If the description had applied to lines only, the well settled rule of construction, that where a course and natural boundary are given, and they do not correspond, the course must yield to the boundary, as more certain, would reconcile them; but if it is only applied to a line run to the *lakes*, it being required to be run east to the lakes, though it might be a question at what particular part of the *Fish Lake* the east line was to terminate, no liberality of construction could substitute a line, widely departing from it, and which would require almost a rightangled line to close on it, when a direct line, in that sense, was described, commencing at the *Hudson*, and terminating at the lake.

Whether the location I have described will exclude the premises in question, is not a subject for the determination of this court; for here, as in the court below, after the law has been pronounced, the jury *only* can apply it to the facts, which are to be collected by them from the evidence adduced; and they only can decide whether the premises in question are within or without it. In this case, if the judge has not given the true construction, he has mistaken the law on the subject, and if, instead of leaving it to the jury to decide whether *De Bruyn's* patent included the premises, he has decided, *as matter of*

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1811.

FRIER
v.
JACKSON.

*law,* that the premises were covered by it, he assumed a right of determining on both law and fact; and in that he has erred.   If, indeed, the judge, in giving his opinion on the result of the evidence, had so charged the jury, the better resort would have been to the supreme court, for a new trial, on the ground of misdirection; but as it comes up, as a matter of law, arising from a fact not denied, *the existence of the patent,* I hold it, if it is well taken, a valid reason to be assigned in error.

3.  The next point in the bill of exceptions, is, that the judge determined that the patent of *Baker* and *Flodder,* supported only by the evidence offered, was void, and incapable of location.

In the exposition of ancient grants, our courts have uniformly been liberal, to give effect to them, according to their intent.   The patent to *Baker* and *Flodder* is an ancient grant.   It is dated in 1677, only three years after the surrender of the colony to the *English,* and intermediate that event, and its final cession, in 1674, a period claiming peculiar indulgence as to the construction of the grants then issued; the descriptions of that day being more inaccurate, from the circumstance of the conquering and conquered people speaking different languages; from the imperfect knowledge of the interior of the country, beyond the shores of the navigable waters; and from the grants not being preceded by actual surveys. All these considerations are connected with the general history of the country, and some of them are deducible from the grants now under examination, and, of course, proper to be mingled, in giving it a construction, if it should be requisite to resort to those aids : for whatever may be the circumstances under which it was made, it must receive its construction from its terms, and according to its intent at the time it was issued ; but to test the opinion in review, it is only necessary to determine whether *this is a void grant.*

From the terms of *Baker* and *Flodder's* patent, it is to

IN ERROR.
.. ..
ALBANY,
Feb. & March,
1811.

FRIER
·v.
JACKSON.

be collected, as a legal construction, that a certain parcel of bush or wood land, together with a creek or kill, with the fall of water, running north and south, lying and being on the north side of the *Emiques'* land, and on the west side of the great kill, was granted.

*Bush* or *wood land*, a *creek* and a *fall*, are descriptions of subjects susceptible of grant; and the further description, lying on the north side of the *Emiques'* land, and the west side of the great kill, without evidence extrinsic the patent, might, by possibility, be as perfect as the ingenuity of man could have devised, for aught that appears from the patent; for the great creek and the *Emique's* land might form a square, a circle, or a polygon, completely enclosed, and defined by those objects.

In every general description of this kind, its application is to be determined from the situation, form and extent of the objects to which it relates ; and both the *Emiques'* land and the creek, though the general bearing of the whole extent might satisfy the terms of description, as lying on the north side of the one, or west side of the other, might be of a shape to enclose the land granted, so as to leave no doubt as to the object of the grant.

Uncertainty as to the application, abstracted from the question of law, must unavoidably exist, as to all grants; for it will be readily comprehended, that it is not possible to make a grant of any parcel of land, by metes and bounds, defined with perfect accuracy, which a stranger, totally unacquainted with the objects of the grant, but from its import, and unacquainted with the country contiguous to it, can locate, without acquiring a certain portion of knowledge for that purpose, extrinsic the grant. He must ascertain the distance and names of the lakes, rivers, or creeks, if either compose part of the description; and in locating the simplest figures, a square or a circle, the place of beginning of the one and the centre of the other, must be necessarily discovered by inquiry, or knowledge acquired extrinsic the grant; and a

*IN ERROR.*
......
ALBANY,
Feb. & March,
1811.

FRIER
v.
JACKSON.

person perfectly acquainted with every circumstance es-- sential to a correct location, could not possess that knowledge intuitively ; but would insensibly avail himself of it, as if it had been expressed in the grant.

The judge, in this case, did not found his opinion on the patent only, but also on the evidence offered in connection with it ; the qualification he made, that nothing more could be protected by the patent than what had been so long held under it, that no other patent covering it could take it away, he obviously grounded on the right of possession only, for it could have no effect on the possessory right, but as evidence that the person possessing claimed the land as his own. From a void patent, no right could possibly be deduced.

This could not be a void grant, on another ground ; for some of the subjects of grant were obviously described with sufficient certainty. A *creek* is a word as certain as a *house :* a *fall,* if a distinct object of grant, is equally so. That a fall is mentioned, when, in fact, there were several falls on the creek granted, which has been urged, though it does not appear, would not detract from its certainty, if the creek passed ; for a grant of a tract of land, comprised in certain and indubitable boundaries, together with a *house,* would pass all the other houses erected on it.

The only authority which has been cited, as applicable to this subject, is one in which a tract of land was granted, as lying in one county, when, in fact, it extended into another. It was held, that it could not operate to pass the land beyond the bounds of the county to which it was limited ; and this cannot, on any construction, be considered as uncertain, for it was *certainly* beyond the limits of the grant. (*Moore,* 176. 3 *Bac. Abr.* 389.)

In this case, the charge was general, that the grant was void. If it is void, this court, by concurring in that opinion, will decide the only question presented on

this point; for it cannot be necessary to examine the construction of a totally inoperative grant. If it is not void, the application of the construction cannot be got at here ; for by pronouncing the opinion of the court below erroneous, all decision, beyond that point, must be extrajudicial.

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1811.

FRIER
v.
JACKSON.

The court below was not correct in deciding beyond the mere question of law; for, as to the facts, the jury were to decide exclusively; and this rule is so rigid, that in an action of *trover*, though a demand and refusal is so far conclusive evidence of conversion, that the court will set aside a verdict finding contrary to it, yet if upon a special verdict, both demand and refusal are found, it has been held, that the court cannot infer a conversion from those circumstances.

I am, therefore, satisfied that the opinion expressed on this point, was not correct; and that in this there is also error.

4. The fourth point did not arise in admitting or denying evidence or matter of law, arising from a fact not denied. It was a proper subject to ground an application for a new trial. It is not, therefore, a point on which the opinion of this court, on a bill of exceptions, can be required.

I have before intimated, that the mode of proceeding, by bill of exceptions, is derived from a statute provision, that it was the intent of the statute to enable a party to avail himself of error not apparent from the record ; that the review is rigidly confined to the precise exceptions in the bill, and to no other ; that it never can be a ground for a general examination of the record, much less of the evidence offered in a cause, which is only introduced explanatory of the bearings of the exceptions ; that the statute did not intend to withdraw from the jury their incontrovertible right of determining upon facts. Hence all the points which have been discussed, not appearing from the bill, were not well addressed

IN ERROR.

ALBANY,
Feb. & March,
1811

FRIER
v
JACKSON.

to this court, and must be considered as out of the case; and whether the patent of *Baker and Flodder* is to receive the one construction contended for, or the other, cannot, on this bill, be a subject of decision. If its correct legal effect had been communicated to the jury, it would have become their duty to have considered the evidence; to contrast, to weigh it, to decide on the relative credibility of the evidence offered, and from the whole, to locate the patent. That they were not permitted to do so, appears to me to be manifest error; and for the reasons I have assigned, I am for reversing the judgment, on the second and third exceptions taken in the bill.

*Lewis*, senator, declared, himself of the same opinion.

*Platt*, senator, also concurred.

H. YATES, jun. senator. The points in this cause, as stated in the bill of exceptions, taken to the opinion of the judge at *nisi prius*, are four. (Here he stated them.)

The rule of practice, as to the first point, has long been settled, the action of ejectment being a mere fiction to try the title. Where the estate does not cease to exist in the heirs, by the death of the lessor of the plaintiff, the suit does not abate.

The second point involves the construction of the patent to *Jane Hendrixe De Bruyn*, granted in *December*, 1686, under which the plaintiff claims.

The description of this patent is as follows: " That certain piece or tract of land lying on the east side of *Hudson's* river beginning from *Davidson's* creek, and from said creek *stretching southerly along the river* to the *Saw-kill* of *Frans Peter Claver*, *and stretching to the*

*east*, and in the woods *to the first two lakes*, or in-waters."

*IN ERROR.*
.....
ALBANY,
Feb. & March,
181).

FRIER
v.
JACKSON.

Was the question now to be decided on the testimony, as presented in the bill of exceptions, the original location, the survey by *Ver Planck* in 1720, the regulations of government in 1731, the division made by *Bleecker* in 1751, and the admissions, as far as the acts of the patentees of *Kinderhook* could be called so, in the subdivision of their patent, would be strong reasons for not disturbing lines which had been acquiesced in for so long a period of time; but we are confined within narrower limits. The question before the court now to be decided is, whether the judge was or was not right in his decision and charge to the jury, and which, on this point, was a mere legal construction founded on the patent itself. A construction must, therefore, be given by us to this patent, without that testimony. The line from *Davidson's* creek to the *Saw-kill* of *Frans Peter Claver*, is along the river; it is admitted that the *Fish Lake* is one of the lakes intended in the grant, and from the facts, as they appear before us, we have reason to believe that the *Fish Lake*, from its form, is the same with the two lakes mentioned in the said grant. Those facts being settled, and in some measure admitted by both parties, it follows, of course, that the river is the western, and the lake the eastern boundary. The only question then to be determined, on this second point, is, what construction must be given to the word *stretching*, as used in the patent; whether it applies to the lines, to the land, or to both; and if applied to either, or both, whether it necessarily follows, that the northern and southern boundary lines of the patent should be parallel to each other, and should be extended from the river, as its base, a due east course, until it intersected a line north and south through the lake. If a correct construction will not warrant the running of the southern line, parallel to the northern, or a due east course, whether

*IN ERROR.*
.....
ALBANY,
Feb. & March,
1811

FRIER
v
·JACKSON.

that line ought to incline to the north, so as to touch the most southern extremity of the lake, or should incline still more to the north, so as to touch that part which is nearest the river, being the westernmost extremity of the lake. *Stretching*, as used in the patent, is, in my opinion, applicable to the lines as well as the land; that it does apply to the lines, is evident from the manner in which the same word is before used in the description of this patent: " From said creek *stretching* southerly, along the river, to the *Saw-kill* of *Frans Peter Claver;*" clearly intending that the line along the river should *stretch southerly :* the *Saw-kill* of *Frans Peter Claver* not extending along the southern bounds of the whole tract: and that the lines, as well as the land, are intended by the word *stretching*, as used the second time, appears evident to me, from the consideration that the place of beginning, at the north-western corner of the tract, had been designated, and the line along the *Hudson*, and the south-western corner mentioned. The general words, therefore, " *stretching to the east*," are applicable to the land, as lying along the described base, and more particularly to the lines as *stretching* from the northern and southern extremity of the base " to the east," or a due east course, as nearly as possible, so as to cause both lines to touch the lake or lakes. If, therefore, a due east course of the south line will touch the lake at all, to this course they ought then strictly to adhere, in ascertaining the true bounds of the patent; but if it will not touch the lake, a straight line, for the southern bounds of the patent, ought to be drawn from the south-western extremity of the base to the lake, deviating from a due east course as little as possible. It would be improper to draw the line from the *Saw-kill* to the nearest part of the lake, unless that part extended further south than any other part of it, but the line must be so drawn as to touch the most southern extremity or projection of the lake. It is immaterial, in my view, whether this line

is the shortest or longest. When a natural boundary and
course cannot both be reconciled or satisfied, the course
ought to be abandoned no farther than is absolutely ne-
cessary to correspond with the natural boundary. If
this line be adopted as the southern boundary, it is ad-
mitted that it includes the premises.

IN ERROR.

ALBANY,
Feb. & March,
1811.

FRIER
v.
JACKSON.

The judge, therefore, was correct, as far as it affects
the present cause, in giving the construction to this
grant, that the premises were included in it; but I do
not agree with him in the opinion that " the whole tract
of land, between the two river stations, must stretch
east, in the manner laid down in the plaintiff's map."

The third point involves the construction of a patent
granted to *John Baker* and *Jacob Janse Flodder*, de-
scribed as follows :

" A certain parcel of bush land, near *Fort Albany*, to-
gether with a creek or kill, with the fall of water, run-
ning north and south, lying and being upon the north
side of the *Emiques*' land, at *Kinderhook*, and on the west
side of the great kill, containing, by estimation, ——
acres of land."

This patent of *Flodder* and *Baker* will not admit of
any possible construction, so as to include the premises.
I am fully persuaded, from the words of the grant, that
it is impossible, at this time, to give any just construc-
tion to it, or to discover what was intended by govern-
ment, except the creek at the fall, and the fall; but
what, or how much land, is uncertain. We can only
judge from the location of it by the patentee, which was
the creek at the fall, and the land immediately adjoining.
If any other possessions or locations did exist, the jury
must have taken them into consideration, under the
charge given by the judge; which charge, in relation to
this patent, was, in my opinion, correct.

The fourth point, in relation to adverse possession,
was properly submitted by the judge to the jury; and I
see no cause of exception to the manner in which this

CATLIN
*v.*
JACKSON.

\* For affirming, 6; for revers- ing, 14.

was submitted by him. The testimony was not such as to make out an adverse possession. I am, therefore, of opinion that the judgment of the supreme court ought to be affirmed.

But a majority of the court\* being of opinion that the judgment of the supreme court ought to be reversed, it was thereupon ordered, adjudged and decreed, that the judgment rendered by the supreme court be reversed, that the record be remitted, and a *venire facias de novo* be awarded by the said court.