This was an action of ejectment, commenced by the plaintiff against the defendant in the county of Rutherford.
The plaintiff produced a grant founded on the following entry: —
"Redmond D. Barry enters 1000 acres of land joining the above
on the upper side, and running up the creek for quantity, April 11th, 1799."
It is admitted by the record and in argument that the expressionabove relates to an entry previously made on the same day in these words: "Redmond D. Barry enters 640 acres of land on a small creek running into Stone's River, opposite to Isaac Shelby's 5000-acre tract, joining Bushnall and Dobbins on the north, and running up the creek on both sides for complement.
"The defendant produced a grant for 240 acres, part of the 1000-acre tract, older than the plaintiff's, but younger than his entry."
From a plat returned in relation to the position of these lands, it appears that Isaac Shelby's 5000-acre tract lies on both sides of the east fork of Stone's River, the general course of which is nearly east and west, but inclining a little north in its downward course; that there are two small creeks which empty into the east fork on the north side; the first empties in near the north boundary of Isaac Shelby's tract, and about 250 poles east of his north-west corner. The other creek empties into Stone's River lower down, and about fifteen or twenty degrees west of north, from that corner distance about one mile.
Bushnall and Dobbins's tract of 1622 acres is situated on the north boundary of Isaac Shelby's, beginning at his north-west corner, running north 400 poles, east 648 poles, thence south 400 poles to Shelby's north boundary, thence along that boundary to the beginning.
The general course of the two small creeks, from their mouths upwards, is a few degrees to the east of a north-east course, and both of them pass through the north boundary of Bushnall and Dobbins. *Page 400 
The tract of 640 acres entered in the name of Barry, and which the plaintiff's 1000-acre tract calls to adjoin, was surveyed soon after or just before the entry was made, beginning at Bushnall and Dobbins's north-west corner, thence north and east nearly in a square, adjoining Bushnall and Dobbins's north boundary 365 poles.
The lowest small creek heads within this tract of land, a small distance south of the north-east corner. The 1000-acre tract was surveyed and granted, as lying on the east boundary of the 640 acre tract. The interference is on the east of the tract of 640-acres, and near the north boundary of Bushnall and Dobbins. The upper small creek passes through this interference.
It appeared that the two tracts of 640 and 1000 acres were surveyed soon after the entries were made, or before; that the lines of those surveys were notorious in the neighborhood. That in the year 1806, before the plaintiff obtained a grant, he settled the defendant on the 1000-acre tract, which he then owned, under a verbal agreement that he should remain there five years as his tenant, make certain improvements, and at the end of the term deliver the place to the plaintiff, as well as acknowledgments that the defendant claimed under the plaintiff.
Whilst Robertson, the defendant, was living on the land under the verbal agreement with the plaintiff, he obtained a grant for 240 acres of the 1000-acre tract, including the improvement and house where he lived.
The Court rejected the evidence of the verbal agreement to rent the land. c. The jury found a verdict for the defendant; the Court was moved to grant a new trial, but overruled the motion. To the opinion of the Court on both grounds there are exceptions, and an appeal to this court.
On the part of the plaintiff in error it is insisted, first, that the defendant was precluded in this action from disputing the plaintiff's title, and relied upon 3 Johns. 223, 504; 1 Term Rep. 760; 2 Term Rep. 53.
Secondly. Independently of the lease and acknowledgment, the plaintiff ought to recover on the ground of his entry being older than the defendant's grant.
In the exposition of these grounds, it is not contended that this agreement is touched by our statute of frauds and perjuries, for that relates only to cases where the attempt is to charge a person on the agreement. *Page 401 
In this case no attempt is made to charge or seek compensation for a violation of the agreement; then it would be within the statute of frauds. The effort is to rebut the defendant, and prevent him from taking advantage of his own wrong. It is further insisted, —
On the ground of the merits, though the Court will not receive parol evidence of the locality of an entry contrary to its evident meaning, yet, in case the entry be doubtful or ambiguous, parol evidence may be received. The Court refused the evidence of the notoriety of the survey in the neighborhood, so as to bring notice home to Robertson.
On the part of the defendant, the counsel rely on having the oldest grant as giving the legal title, which cannot be set aside but on clear, strong, and satisfactory grounds. The case was then considered by the counsel for the defendant.
First. That Robertson being put into possession by Philips under a verbal lease did not estop him from disputing the plaintiff's title.
Secondly. Philips's grant is the youngest, and the defendant's elder legal title cannot be overturned by a strained or forced construction of Philips's entry; all reasonable intendments are to be made in support of the grant.
Thirdly. An ejectment must be supported by a paper title, and not by mere right of possession as in England.
By way of elucidating the first proposition, it is urged thatPhilips committed a fraud by inducing the defendant to lease the land, expend his money, and employ his labor in making improvements, when Philips knew he had no right to the land; it was an attempt to make a person pay for that which did not belong to him. And when the defendant found that his lessor had no right to hold the land by virtue of the entry, surely there was nothing immoral in his endeavoring to get a right himself, by entering and procuring a grant for it.
The second proposition of the defendant calls for a construction of the plaintiffs entry, which it was conceded must be taken in connection with the entry for six hundred and forty acres. It is insisted that the word opposite, used in the entry for one thousand acres, refers to the mouth of the creek, and not the body of the land entered, which would make the six hundred and forty-acre tract lie on Bushnall and Dobbins's north boundary and on the upper creek instead of the lower, where it has been surveyed. Placing the six hundred and forty-acre tract on the upper creek, where it should have been surveyed, would occupy, it is said, the land *Page 402 
claimed by the defendant, and then making the one thousand-acre tract adjoin the six hundred and forty, which it must do, either on the north or east, it would not touch any part of the defendant's claim. The lower creek, by no reasonable construction, it is argued, can be said to empty into the east fork of Stone's River, opposite to Isaac Shelby's five thousand-acre tract, for the mouth of that creek is notopposite to any side or end of Isaac Shelby's tract: therefore,Philips's entry is not surveyed agreeably to its calls, and on this ground the defendant must prevail.
"That a frequent recurrence to fundamental principles," is a maxim admitted by all; and on no subject is it more important than in the discussion of questions respecting real property.
Under this impression, it will be shown what principles are evident from the statutes, respecting the appropriation of vacant lands. In the second place, it will be necessary to recur to contemporaneous usage under these statutes, with occasional remarks how far this usage was conformable to the provisions of the acts. Thirdly, the usage of the western part of the State of North Carolina, and how far such usage was conformable to contemporaneous exposition; and, lastly, the legal or equitable consequences originating from a departure in the usage of the western country from the requisitions of the statutes.
First. By recurrence to these statutes the following propositions seem evident, and require no illustration: —
1st. That all entries are required to be surveyed and granted, in the order in which they were made.
2d. That, in making those surveys and grants, the officers of government act independently of, and without the control and direction of, the claimants or owners.
3d. In making entries or locations, claimants are directed
to express in them "the nearest watercourses, and remarkable places, and such watercourses, lakes, and ponds as may be therein, the natural boundaries and lines of any other person or persons, if any, which divide it from other lands."
4th. The surveyor is directed, in surveying entries, to run them out in squares or oblongs (not exceeding in length twice the breadth), unless the lines of older claims intervene, in which case he is to bound the surveys on such older claims; and when a survey shall be made on any navigable water, the breadth on the water shall not be more than a fourth of the distance back.
Secondly. The next inquiry is, how were these *Page 403 
provisions of the law executed in North Carolina immediately after the passage of the Acts of 1777 and 1783? As the law required, warrants of survey, containing a copy of the entries, were delivered, numbered, and dated in the order in which they were made, to the respective principal surveyors of each county.
These warrants were made out by the entry takers, and delivered to the surveyors, who proceeded to survey the same, beginning with the oldest, carefully avoiding to run the lines of a younger entry in any case into an older one. This is a prominent feature in the law, which was carefully observed for many years after the first land law.
In 1787, c. 23, the legislature uses this language, whereas by misconstruction of the several laws respecting the entering and surveying lands in this State, impositions have been attempted on the original enterer of said lands." The remedy provided anddeclared is, that surveyors are commanded to survey the oldest entries first; and that in case a younger enterer shall get an older grant, it is declared void and of no effect, as opposed to the first enterer.
It appears from the practice which obtained in North Carolina, that the idea of notoriety, so much talked of here, never occurred. It was a settled country, and the owners at hand; the surveyors, proceeding in the order of date, applied to them to show their lands entered; there was no inquiry whether the entry were notorious. The first enterer was considered as the first purchaser of the State, having first paid his money, and having a statutory provision that his claim should be first perfected. Thus it happened that nearly every entry was surveyed in that country; at first, when vacant land was easily obtained, there was no such thing as an interference heard of, as surveyors would not survey a younger entry so as to interfere with an older one, and consequently an older survey.
But as good land became scarce, the propensity of the younger enterer to contend for his first choice or pre-emption, or in other words to usurp the right of the first enterer, became irresistible; surveyors gave way to it in some instances, whereby, as the legislature of 1787 supposed, impositions had been attempted; the remedy provided, however, is worthy of remark. It does not tell the younger enterer that his right may be saved by the want of notoriety or even specialty in the older entry, but, making short work, simply that the grant obtained upon a younger entry shall be void.
This act I consider as declaratory, and leaves the right of the elder enterer in as good a situation as if the surveyor *Page 404 
had done his duty in making the survey of the elder claimant first. A court of equity would have said as much. Our courts have adopted this provision of the Act of 1787 among legal, as distinguished from equitable principles.[1] The consequences will hereafter be considered in the fourth proposition.
In the practice of North Carolina, entries were considered asspecial or vague, not as being notorious or otherwise; and this distinction was well settled previous to the Act of 1786, c. 20, which may be thrown out of view as making no part of the permanent regulations of the land laws. It is scarcely requisite to demonstrate the difference between specialty andnotoriety. It may be exemplified thus: A location for six hundred and forty acres, calling to include a beech tree, marked with certain letters, on the waters of a certain creek ten miles in length, would be special without any other description, but notnotorious, unless known by the people in that part of the country.
It is remarkable that we meet with no case of a dispute in court, in the State of North Carolina, between a younger and an older enterer; it being a well-known fact that notoriety was never regarded in that State. The want of specialty was sometimes made the ground of opposition in caveats. But if the objection did not obtain on acaveat, in legal presumption it was waived.
Certain inferences are clearly deducible from this practice in the State of North Carolina, and the acquiescence of society in it; first,notoriety was never inquired for; secondly, that all the surveyor required was specialty, or in other words, some call in the entry sufficient to prove to him that the land surveyed was the same that was entered. Such, for instance, in the language of the act, "as the line of some other person which divides it from other lands," marked trees, c.
A total disregard of such specialty as might enable others than the surveyor to find the land entered, obtained in practice. The law in relation to making entries was considered as directory, as it no doubt was.
Such description as would enable the surveyor, on inquiry, to run out the land, no doubt was intended, but if not sufficient for that purpose, unless inquiry were made of the owner or locator, whether the land should be lost, will be considered presently.
Thirdly. What has been the practice of the surveyors in the western part of the State of North Carolina, or of this State, in surveying lands under these legislative acts? *Page 405 
Instead of observing priority of entries, and avoiding interferences, as the statutes required, and which was observed in North Carolina, surveys were made here without regard to priority of entry or care to avoid an older claim.
In North Carolina, deputies surveyed in particular districts, in general knew the lines of previous surveys, and were able to avoid interferences.
Owing to the unknown, unsettled, and wilderness state of the country here, as well as the absence of claimants, it was not in the power of surveyors to proceed according to priority of entry; and if deputies had been assigned to particular districts, which was not the case, interferences could not have been avoided generally.
In few cases of entries made in a wilderness could the surveyor expect to find the land entered, without being shown; and to make search for it alone was attended with too much difficulty and danger.
Generally, surveys were not made until owners or agents attended to show the land. In the early stages of the country, these owners were abroad and no person attended; of course, in such a state of things, innumerable young entries were surveyed before older ones; interferences in abundance took place, and the youngest enterers obtained the oldest grants. This practice was not only contrary to the express statutory design of the legislature of North Carolina, but to the uniform current of practice there. See Acts of North Carolina, 1783, c. 2, § 19; 1786, c. 20; 1787, c. 23; 1796, c. 9.
As a necessary branch of this part of the argument, we are to consider the progress of thinking on this subject in this country. In the spring of 1789 I commenced the practice of law here, and it is well known, in relation to that part of the practice which embraced the investigation of land titles, that practice was as extensive as any of the few who were at that time at the bar. Since that time, either as a lawyer or a judge, no time has elapsed without employment.
Many of our lawyers, and a great proportion of the citizens of this part of the State of North Carolina, emigrated from either Virginia or Kentucky, particularly the latter State. They brought with them their habits of thinking and modes of expression in relation to the acquirement of vacant lands, so interesting to early adventurers. Hence the expressions, notoriety of the calls of entries,notorious descriptions therein, c.
With the people from Virginia and Kentucky, with whom we were in the daily habit of conversing, the expressions *Page 406 
were in common use, and as the old colonial method of appropriation by warrant and survey (in which the ideas of notice or notoriety never occurred) was forgotten, it was not commonly seen that an entry here, any more than in Virginia or Kentucky, could, or was intended to, answer any other purpose than to give notice to subsequent enterers.
In those States, the statutes expressly required that entries should give this notice, or possess the notoriety spoken of. But not so in the laws of North Carolina.
These ideas and expressions, thus derived, were soon found, as might naturally be expected, in judicial proceedings. Notorious andspecial, the old North-Carolina expression, soon became synonymous or convertible. Thus it was quite common in courts to hear lawyers and judges speaking of entries possessing sufficientnotoriety or specialty to enable those acquainted in the neighborhood by reasonable industry and inquiry to find them. The transition seemed to follow of course, that the construction of entries on the ground of notoriety, which had taken place in Kentucky, should be contended for in our courts. Thus we see it attempted in the case of Hoggat v. M'Crory, 1 Tenn. 8, in the year 1799. But the North-Carolina principle prevailed.
About the time of the decision of this case, the Virginia and Kentucky principles were abandoned, and the law seemed to have settled down on the principles which had obtained in practice in North Carolina, with some deviation as it respects the mode of redress, which appeared to be unavoidable, considering the departure from the North-Carolina principles of the land law, in relation to surveying, that had taken place in this country.
In the instructions of the District Court to juries about this time, it was stated that an entry should contain such notoriety orspecialty, using the expressions as convertible, as that the surveyor or other person might find the place called for by reasonable exertion, or inquiry of those acquainted in the neighborhood where it lay. It was admitted that when the tree, spring, or line of another survey called for, as the case might be, was found, that the North-Carolina mode and latitude of surveying might obtain.
Specialty as to boundary was completely abandoned, and the law considered as settled for many years. In fact the specialty
adopted by us at this time never came up to the idea ofnotoriety derived from the laws of other States. We did not square or centre calls in making surveys, nor restrain them by presumptive meanings given to entries. No other *Page 407 
restraint was observed but what was expressly called for in entries. If older claims or lines interposed, we ran bounding on these lines in any shape, so as to get the quantity of land, as practised in North Carolina.[1]
An entry calling to adjoin the lines of another survey, whether notorious or not, was good by the words of the Acts of 1777, c. 1, § 5, and 1783, c. 2, § 11. See Laws of Tennessee, 1807, c. 2, § 40. And this express statutory provision at once cuts up by the roots the idea of notice or notoriety in entries, upon the principles established in Virginia and Kentucky. Still the courts did not altogether abandon the idea of notoriety, so specious and fascinating in its theory. Though it was then well understood how the law was interpreted in North Carolina, the idea of notice or notoriety had taken such hold in this country, in consequence of its peculiar situation, that the courts could not bring themselves entirely to acquiesce in the ground on which things rested in North Carolina.
According to the views which had obtained there, a case of specialty in an entry could not occur after grant. It was a point which could only be rendered available on caveat. To an inflexible adherence to this principle here, considering the dangerous and wilderness state of the country, the principles of equity seemed opposed. The idea that a younger or an older entry should be precluded from any remedy in a court of equity, because a grant had issued, could not be endured, when it was universally known that the requisites of the law in surveying and issuing grants had not been observed. It was remarked, too, that this non-observance of legislative provisions had originated from the peculiar, wild, dangerous, and unexplored situation of this country.
It was recognized as a principle, that to give an elder entry the preference over a younger one, intended by law, that it should not be vague, but contain such specialty as would enable the surveyors and those acquainted in the neighborhood, by reasonable industry, to find some call in it to enable the surveyor to survey it, so as to run out younger entries without interference, c. The same degree of precision in the notoriety of the calls, or in the mode of surveying, as was required in some other States, did not obtain here.
The only departure from the practice of North Carolina on the subject of the investigation of land titles, which seemed to be recognized by our courts previous to the year 1806, related to the remedy or mode of redress, and not the provisions or principles of the statutes.
Upon the plainest principles of law, these provisions must *Page 408 
have remained the same, as all courts were bound to decide according to the statutes in force.
In relation to the mode of redress, the question was different. Agreeably to the frame of the statutes of North Carolina, thecaveat was the remedy provided for cases of specialty or want of specialty in entries. Yet in practice, this remedy was found greatly inadequate in the western part of the State, now Tennessee. Equity, from its intrinsic nature, lent its aid when the remedy was lost at law. Hence so many instances of equitable precedents here, when none are to be found in North Carolina, where the statutes were framed and first acted on. Subsequently to this time it was determined that, in questions of specialty, remedy might be had at law by force of the Act of 1787, c. 23. See the case of Vincent's Lessee v. Conrad, 4 Am. Law Journal. This latter point was much contested, but settled at length.
It is believed courts of equity or of law cannot, consistent with the principles of either, take stronger grounds against a first enterer or purchaser (leaving personal notice, or notice in pais, out of view) than could be maintained on a caveat, the principles and commands of the statutes being the same in any court, and under any form of redress.[1] Our practice has only extended the remedy beyond what was contemplated by statute, which was found to be evidently inadequate in the western part of the State of North Carolina, owing to the wilderness state of the country.[2]
This state of things continued until Tennessee obtained the right to perfect titles to lands in the year 1806. Then a renewed emanation of warrants revived the dormant enterprise of land adventurers, and distinct interests in society arose, — those of the holders of unsatisfied warrants who were in search of land to satisfy them, on one hand, and land holders on the other. Vacant land was scarce; it had been principally entered and granted. The contest was renewed; the warrant holder, desirous of enlarging the fund of vacant land, or such as would be liable to appropriation, insisted strongly on notoriety of first entries, and particular modes of surveying in conformity with those principles, being thereby *Page 409 
enabled to procure land which had been previously appropriated according to ancient usage.
In the case of Smith v. Craig,[1] in this court, the ancient principles were recognized by both of the judges, as well as in the case of Kendrick v. Dallum,[2] and Ross and Brown.[3]
In the progressive scarcity of vacant land and increase in the value of landed property, we find ample reasons for the length and obstinacy of the contest between the warrant and land holder, the former, as it were natural to suppose, being restless and clamorous, thereby producing a public impulse.
This contest will continue so long as warrants or unsatisfied claims are in existence,[4] and the courts will lend an easy ear to the endeavors of such claimants to break in on the principles upon which old claims have been understood to rest. Hence the importance of processioning or *Page 410 
renewing the ancient land-marks of the law in relation to entries, for the purpose of putting an end to those disputes.
The fourth and last branch of inquiry presents itself, with remarks of illustration. What are the legal or equitable consequences arising from the departure contemplated in the third division of this argument? It seems to be admitted, without a question, that an older entry with a younger grant may contest with an older grant on a younger entry, either at law under the Act of 1787, c. 23, or in a court of equity. The decisions of our courts have settled those points on the ground above alluded to. Owing to the peculiar situation of the country, I entirely accord with the reasonableness of these decisions, so far as they afford a remedy in equity, and entirely acquiesce on the other ground.
Upon what principles is this contest to be conducted? is the question. Shall we adhere to the spirit and meaning of the statutes of North Carolina, as interpreted by contemporaneous usage, modified by the practice of our courts previously to the year 1806, or shall we strike out some other plan, adopt some new system, disregarding the ancient land-marks of the law? Shall we adopt the systems of Virginia and Kentucky? That will not do, because, by the decisions of this court, following the steps of our predecessors in the late superior courts, we have already far departed from them in the case of Kendrick and Dallum,[1] Ross and Brown,[2] Smith and Craig,[3] at Nashville, and Stubblefield and Carter v. Ward [4] on a caveat
at Carthage, as well as many others. The case of Shepherd and Baily in the Federal Court at Nashville, 1 Cooke's Rep. 369, went off on this ground. In the last case, tried a second time in June, 1815, the North-Carolina principles in surveying entries were sanctioned by two juries, composed of the best informed and most experienced men the country afforded.[5] *Page 411 
For myself, I can say that a strict adherence to the decisions of our courts, previous to the year 1806, will be observed so far as the principles of those decisions go, and when *Page 412 
they fail, the statutes of North Carolina, on which our own rest, with contemporaneous construction, will be the guide; not the fluctuating passions and interests of society, which change with times and circumstances. *Page 413 
I deem myself bound by the precedents and settled decisions of our courts.[1] It seems strange to conceive how certainty as to notoriety in entries should come to be thought *Page 414 
indispensable, when our laws do not require it, and for more than a century under the colonial governments, in all the colonies (now the States), it was unknown, the appropriation being by warrant and survey, afterwards perfected into a *Page 415 
grant. An evidence of this is the great case of Hickman and Boffman, Hardin, 348, which, together with the case of Astods v. Miller, ib. 193, on the subject of preference rights of pre-emption, cannot be too carefully examined.
An entry agreeably to the laws of North Carolina possesses one or the other of two characters, vague or special. The first is so entirely defective in its description of locality, as to furnish no rational ground of belief that one place more than another was intended. The latter, or a special entry, possesses properties the reverse of those that are vague. It has some call, which, according to the decisions of our courts, is ascertainable by reasonable inquiry and exertion. What shall amount to this reasonable inquiry and exertion must depend on the frame and texture of the laws of North Carolina, evidenced by the decisions of the courts on usage and contemporaneous exposition.
A special entry is always available, and uniformly has been considered so in all the cases finally decided, to the extent of the quantity of acres called for in the entry and included within the survey, unless restrained by the express terms of the entry, by natural boundaries, or by older claims. The term express is used in contradistinction to implied, for it may be safely advanced as an obviously plain proposition, illustrated by the case of Astodsv. Miller, Hardin, 193, that if an implied meaning is to be given to an entry (when there is a latitude in making the survey), that party alone is entitled to the benefit of the implication who has the pre-emption or preference in having his title perfected. By our laws, this pre-emption is given to the oldest enterer.[1]
Conformably to the principles of law, implications cannot be indulged against the first enterer who is a pre-emptioner. In fact, the construction of all entries, whether youngest or oldest, is the same; namely, after grants, surveys are good unless contrary to their express words; and under such circumstances, he who has the oldest entry has the best right agreeably to the Act of 1787, c. 23, which declares that an older grant on a younger entry shall be void as against such older entry.
By the settled decisions of our courts, if an entry call to include a particular spot, the law will not presume the enterer intended to place it at any given point in the survey, but that an option was intended to be reserved to place it in any part the surveyor might think proper when the survey should be made. So of an entry beginning at a certain special point without specifying any course, a survey in any direction from that point will be good. In fine, an entry *Page 416 
must be either good or bad. If the first, the preference in the survey and grant or right of pre-emption, secured by law to the oldest enterer, excludes the idea of a survey being restrained by a meaning to be collected by implication. Hardin, 193. When the surveyor makes the survey, which is not contrary to the express meaning of the entry, by what rule of reason, law, or equity, can you deprive an elder enterer of any part of his survey? He will be told that he must give way to a subsequent enterer, who had a right to be informed by the older entry in what manner it was to be surveyed, so that he might appropriate land in safety. It is answered, that might be correct enough, provided this subsequent enterer were put on an equal footing with the elder one in having his right perfected. In advancement of the preferences given by statute to the older enterer, the courts in North Carolina and here have long and uniformly decided that the elder enterer is not obliged to point out in his entry the manner in which the survey shall be made, so as to give the notice contended for. A latitude in making the survey is secured by statute; the legislature has so ordered it, and the younger enterer has no right to complain. Ita lex scripta est.
It is admitted by all, that in surveying an entry, calling to include a spring, the survey may include it in any part. So of the case put of a beginning without course: both entries are good and may be surveyed (observing statutory restraints,) in any manner, so that the calls are complied with. In these instances, as well as many others that might be put, it is evident that all ideas of precise metes and bounds are lost sight of. Then why insist on it in any case? It is in vain to do it and think of being supported by former decisions or established principles. One uniform principle runs through all these decisions, and to avoid inconsistency must govern all cases; to wit, negative implications or presumptions cannot be drawn from entries to impair the rights communicated by them, unless obviously and plainly deducible from the expressions used. If boundaries are not fixed by entries, a strict construction is necessarily excluded, that being always done to fix boundaries. A liberal one must unavoidably obtain in preservation of the latitudinary right of surveying.
Now, what does the establishment or indulgence of these presumptions import? Manifestly, nothing more nor less than an effort to give precision to the meaning of entries, so as to produce the effect of metes and bounds. If, by construction, the effect of metes and bounds is made to apply *Page 417 
to entries of general description, it must in all such cases.
In Kentucky, this process resulted from the provisions of the statute law. And it may be well to remark at once, that it was a provision somewhat inconsistent with the nature of an entry in a wilderness country, where in such a state of things nothing more could be expected from an entry than a general notice of some call in it, leaving the ascertainment of metes and bounds to be subsequently fixed by a survey agreeably to the nature of things.
All the cases or decisions in our courts, previously to the establishment of the Supreme Court, excluded the idea of implied construction, or an effort to give in effect boundary to entries. So of the cases before alluded to in the Supreme Court. Depart from this principle, no rule can be found to operate in all cases, and hence decisions not bottomed on it must be inconsistent with the ideas of thirty years' experience, and wholly depend on the arbitrary discretion of the judges.[1]
By law, a latitude is allowed in the survey, or it is not. It has been shown from practice, the spirit of the statutes, and precedents, that it is allowed; and no case, though there have been many, has ever been decided otherwise. Presumptive restrictions in the meaning of entries are inconsistent with this latitude.
To say that a person has a privilege by law to do or have a thing done for his own benefit, and that you will on presumption restrain him from doing it, is contrary to all legal ideas and a manifest violation of rights, by depriving a person of property without his consent; for that cannot be implied in such a case, contrary to the act of the surveyor in making the survey and the presumption. Such consent must be expressed.
This latitude in surveying is for the benefit of the enterer, and the presumption in fact is, that the privilege is meant to be exercised, and not that a restraint is intended in the entry when none is expressed. Co. Lit. 28, 217; 2 Inst. 203.[2]
To subvert this presumption in relation to the intention of the enterer, nothing less than a clear expression of a fact inconsistent with it is sufficient, and that fact consistent with the provisions of law.
An entry either affords a latitude in surveying, or from its express terms imposes a restraint. Two inconsistent presumptions cannot arise from the same fact. The law presumes no restraint; in fact, none was intended unless *Page 418 
expressed; to presume a restraint on the enterer would be inconsistent with the other stronger presumption, and therefore not sustainable.
Freedom, or exemption from restraint, is universally desirable by all men. It is a law of nature; unless the municipal law imposes a restraint, agreeably to this natural law, it is never presumed that a man intends to impose one on himself. It is the first and most important principle consecrated to liberty in a free state, that there should be no other legitimate source of restraint on any of our actions than what the law imposes. In the surveying of an entry having a specialty, the law imposes all the restraint that exists, except what a person chooses to impose on himself by his entry. Statutory restraint is one thing, and voluntary restraint another. The first may be collected from the following expressions with a few others to be found in the statutes November, 1777, c. 1, § 10: "Every survey shall be bounded by natural boundaries or right lines, running east, west, north, and south, and shall be an exact square or oblong, the length not exceeding double the breadth, unless where such lines interfere with lands already granted or surveyed." 1783, c. 2, § 19: "The surveyor shall proceed in his surveys according to the number and date of the respective entries."
Again, in April, 1779, c. 6, § 6, "Entries are to be surveyed in turn, the eldest being first surveyed." In 1787, c. 23, § 1, it is said, "that surveyors in the several counties in this State shall survey all entries of land according to the priority of such entries, paying due respect to the number of each warrant; and every grant hereafter to be obtained by any subsequent enterer or enterers otherwise than is by this act directed, shall be and the same is hereby declared void and of no effect." With a proviso, "that the subsequent enterer shall not be prevented from surveying and obtaining a grant for all such surplus land as shall remain after the (first) enterer or enterers of such land hath surveyed his, her, or their entry or entries." October, 1779, c. 4, § 7, uses this language, "that when it shall so happen that any person or persons shall have made or hereafter may make any entry of land on any navigable waters, and shall be prevented from running out the same agreeably to the directions of the before recited act" (1777, c. 1, § 10) "by the boundary of any land heretofore run out, that then and in that case the surveyor may and shall run out and survey the same in the same manner that other lands are directed to be laid out." *Page 419 
See also April, 1784, c. 14, § 7; April, 1778, c. 3, § 7; April, 1783, c. 2, § 20; April, 1784, c. 15, § 3; Land Law of Tenn., 1807, §§ 38, 40.
These restraints are public and general, imposed on the surveyors by the law itself, and commanded to be observed.
Voluntary or individual restraint must always be consistent with statutory and legal restraint, and is contained in the entry, and imposed by the enterer on himself; the surveyor is the public agent to execute the intention of the enterer appearing from his entry, so far as is consistent with statutory or legal restraint.
This individual restraint is never presumed; such presumption being an abridgment of freedom of action, contrary to the law of nature, and not for the benefit of the enterer.
In relation to presumptions, C. J. Taylor thus observes: "The facts from which presumption is deduced ought to be consistent with the proposition, which they are intended to establish," and further, in the same, "presumptive evidence ought not to rest upon conjecture and surmise; it must be built on a solid foundation. A legal presumption does not arise, because probability preponderates on one side rather than on the other. It is created only then, when the circumstances are such as to render the opposite supposition improbable."
This opposite supposition exists in an imputed or implied intention of restraint in an entry, which is improbable, as being in general not for the benefit of the enterer, nor agreeable to nature, by abridging future freedom of action.
The opinion further states, "and when we are about to defeat a right, the presumption ought to be stronger than when it is to be supported. Cowp.216."
Now, for what purpose is this doctrine of implication or presumption always set up in this country in relation to the intention of entries? Is it not to support the right of the younger entry, and defeat that of the older one, which according to common understanding, without such presumption would be good? It surely is; and a presumption that it was the wish and intention of the enterer, that the survey should not be restrained, being stronger than its opposite, must prevail.
These principles respecting the doctrine of presumptions are conformable to another well established principle of law; which inculcates the idea that such construction must be given to all instruments of writing as was intended by the parties at the time of their formation. Frier v. Jackson, 8 Johns. 495; Md. 212, 233; Camp. 22. *Page 420 
Will any person pretend to say that it was not generally understood that a latitude in the surveying of entries of general description, utterly repugnant to all ideas of implication, was not given or allowed by our laws? It is believed not. The result is, that entries must either be as special as surveys, or only afford a general notice. The latter is the principle adopted by the courts, and uniformly adhered to by citizens, lawyers, and courts, from the earliest times, and we are not at liberty to depart from it. It is the law of the land, founded not on abstract principles of equity, but on the statutes of the country.
In this country the holding an enterer to strictness in his entry, as to notoriety, would be manifestly repugnant to the spirit of our laws. Instead of encouraging second or subsequent enterers to dispute with older ones, by requiring of them notoriety of description, the remedy provided is, that the younger enterer may remove his claim to other vacant land; it is not a contest, as in Kentucky, de damnoevitando, or who should be subjected to a total loss, which by equitable construction might reasonably induce notoriety or notice of boundaries in prior entries, but a contest for the first choice or pre-emption, which is expressly by statute secured to the first enterer or purchaser.
The case in principle is precisely similar to the one of Astodsv. Miller. The principle laid down in that case is, "that a liberal construction should be given to legislative acts, in favor and preservation of rights of pre-emption."
By our statutes, the older enterer has secured to him a right of pre-emption. See Acts of 1787, c. 23; 1783, c. 2, § 19.
Whether the question be considered as one merely legal in its nature or equitable, the effect is the same. As a legal question, every deed or writing which passeth an interest must be construed for the preservation of right, and to take effect if by any reasonable means it can. This principle applies to entries as well as grants. See 5 Johns. 440; Van Gordon v. Jackson, 6 Cranch, 148.
Placing the subject in an equitable point of view, that which the law required to have been performed by its officers, must be taken as done.
And the act of the officers of government (viz.), the surveyor and secretary, over whom the enterer had no control, shall not put the claimant in a worse situation than if the law had been complied with. The officers of government should have procured for the elder enterer the oldest grant.
In effect, then, and conformable to the equitable principle *Page 421 
of the Act of 1787, c. 23, we are to consider the first enterer as having the oldest grant;[1] in other words the Court must place him in as good a situation as if he had.
In this state of things, the younger enterer on equitable principles, objects to the validity of this grant, on the ground that the elder entry wants specialty. In the case before the Court, it is admitted that the entry of 1000 acres was surveyed adjoining, and above the 640, not as to the lower creek, for it is beyond the head of it, but in relation to the general direction of this watercourse, as well as others.
It has been insisted that the mouth of the lower creek, the call claimed by the plaintiff, is not opposite to Isaac Shelby's land, and that the mouth of the upper creek is; and therefore, the 640-acre tract should have been placed on the upper creek; in which case, to make the 1000-acre tract adjoin above, there would not be any interference; and beside that, as the lower creek did not go beyond the bounds of the 640-acre tract, it is manifest the upper and not the lower creek was intended by the enterer.
"It is a principle well settled," says C. J. Edwards, in the case of Hickman v. Boffman, Hardin, 362, "that every officer acting under the sanction of an oath, or in whom the government reposes a trust, shall be presumed to have done his duty until the contrary be proved. This is a principle of the first necessity in society, and indispensable for the preservation of the rights of those who by law are obliged to commit their interests to the management of public agents. The law reposes a special trust in the officer, and the citizen is obliged to trust him. Precarious and perplexing indeed would be the situation of the individual, if he were obliged to prove that the officer had done his duty, or if the presumption of his having done it were not indulged until the contrary be shown."
It was the duty of the surveyor to survey the plaintiff's entry on the ground entered, April, 1784, c. 14, § 7.
The presumption is, that he surveyed agreeably to law. The survey is always evidence in this point of view, but not of notice or notoriety. Has the younger enterer shown, either that the elder entry was so vague, or surveyed manifestly repugnant to its calls, that it should be void? It would seem that he has not, unless it be on the principle that above would go beyond the head of the creek, there being no creek to run up, which will presently be considered.
On other grounds in relation to specialty the law is clearly with the plaintiff.
"In favor and preservation of the rights of pre-emption," *Page 422 
it is not a strained construction to say that the enterer meant that it was the body of his land entered, and not the mouth of the creek which was referred to. The surveyor, whose duty it was to lay the land on the right place, thought so, and the rules of the construction will warrant the idea. The primary object of the enterer was to fix where his land should lie, not to point out the mouth of a particular creek. See Frierv. Jackson, 8 Johns. 495.
The entry calls to adjoin Bushnall and Dobbins's 1622-acre tract on the north; it was so surveyed. This call is definite, about which there is no dispute. The survey of 640 acres is made on both sides of a small creek, and a survey of 1000 acres under which the plaintiff claims adjoins on the east or above, though not on both sides of the creek; as that came to an end in the first tract of 640 acres. It is not pretended the entry is vague, but insisted the survey is not made agreeably to it.
Let the principles previously detailed be applied. There are two creeks, either of which may answer the description in the entry, as passing through the north boundary of Bushnall and Dobbins.
The question is not whether the upper creek will answer the description somewhat better than the lower, but does the latter, according to plain common understanding, reasonably comport with the description of the entry? If it does, and the entry be special in preservation of the right of preference afforded by statute, the 1000-acre tract must prevail. It is no objection that there is another creek or place to which the entry might apply. In support of the elder entry we cannot presume that the lower creek was not intended by the enterer. The entry has no express words communicating that idea, and the rules of law will not permit us to raise the presumption.
According to usage, adjudged cases, and the principles of the statutes, there does not seem to be such a departure from the calls of the entry as to warrant the Court in saying that the plaintiff shall be deprived of his statutory preferences and benefits, by being the first enterer or purchaser. Nor would it seem to be correct, on the principleut res magis valeat quam pereat, that the entry of 1000 acres should be lost, or rendered unavailable, because the creek happened to run out or come to an end in the first survey of 640 acres, which the 1000 acres called to adjoin.
Without the call to lie on both sides of the creek, there is sufficient specialty in the entry to give it validity. It is a well settled principle, that if all the calls of an entry cannot *Page 423 
be complied with, yet the entry shall be good if those remaining are sufficiently special. 1 Tenn. 377.
Much argument has been employed to show that the defendant is not estopped by his lease and acknowledgments that he held under the plaintiff.
The basis of this argument rests on a supposition that in every case in ejectment the plaintiff must make out his case by deeds of conveyance. This is certainly not the law. It is true that when the plaintiff claims possession by virtue of a fee-simple estate in the land, he must make out his title by deeds of conveyance, c.
But an estate for years will give a right to bring ejectment, and that may exist by some memorandum in writing without deed. A lease for one year may exist without deed, and the tenant hold over whether the lease be for one or more years. Under these circumstances it is consistent with sound reason and morality that he should be bound not to dispute the title of the landlord. His acknowledgments ought to be received in evidence here as well as in England.
Let the tenant return the land or deliver possession to his landlord agreeably to his contract, and then he will be at liberty to dispute titles with him.
These are the impressions entertained by the only judge now sitting, who will ever feel disposed to give parties an opportunity to have their rights decided by a full court; and as it is expected there will be one at the next term, let the cause be continued for further argument.
NOTE. — See this same case 4 Hay. 154, and 5 Hay. 101. See also Hickman's Lessee v. Gaither, 2 Y. 202, where this case is cited. — ED.
[1] 1 Tenn. Rep. 8.
[1] 1 Tenn. 360; ante, 340.
[1] Courts of equity as well as law are bound to respect legal priorities. 10 Johns. 522.
[2] The land law of Kentucky was the same with that of Virginia, the parent State; and a similar extension of redress took place in Kentucky. 1 Munf. 299; 1 Wash. 116; 3 Call. 266; Hardin, 438.
[1] Ante, 287.
[2] Ante, 211.
[3] Ante, 210.
[4] According to the present frame of our laws, it is not probable unsatisfied claims will soon cease. As early as April, 1778, c. 3, § 2, the State of North Carolina refunded the purchase-money if land entered and not granted had been lost by a better claim. In April, 1784, c. 14, § 7, and in October 1784, c. 19, § 6, the legislature of North Carolina provided an additional remedy in such cases, by permitting the enterer to remove his claim for the land lost by better claim, and take land elsewhere in lieu of it. In 1793, c. 23, § 5, the law respecting refunding purchase-money in such cases was repealed, and that respecting removals left in force. And after grants were obtained this principle, enabling the grantee having the inferior title to obtain a warrant for other land in place of that lost, was adopted by North Carolina, as respects military and John Armstrong's claims. See Acts of North Carolina, 1796, c. 9; 1802, c. 12.
When Tennessee obtained the right to perfect titles, a similar provision with the last was adopted in relation to every kind of claim where grants had issued from North Carolina. 1806; c. 1, § 25-27.
By the Act of 1807, c. 2, § 8, the provision is extended so as to embrace claims on grants for lands lying South of Tennessee River, within the Cherokee countries. By the Act of April, 1809, c. 7, the provision is further extended, so as to enable holders of grants issued by North Carolina, for lands between Waker's and Henderson's lines in East Tennessee, which should be lost by Virginia grants, to obtain warrants. By the Acts of September, 1809, c. 122, and 1812, c. 26, a further extension of the remedy is provided so as to embrace grants for lands issued by Tennessee which were lost by better claims emanating from the same State. No provision has yet been made for obtaining warrants upon grants issued without the limits of the State through mistake. See Act September, 1811, c. 23; nor for grants obtained west of Brown's line in East Tennessee, which are void agreeably to the Act of 1778, c. 3, § 5.
[1] Ante, 211.
[2] Ante, 210.
[3] Ante, 287.
[4] Ante, 340.
[5] When this case first came before the Federal Court, M'Nairy, J., sat alone. See a full statement of the case in Cooke, 369. The jury who tried the cause were Sherwood Green of Williamson, Gen. Thomas Johnson of Robertson, Anthony Foster and John Davis of Davidson, who had been early settlers in the country, and surveyors of lands under the laws of North Carolina; George Breckenridge of Maury, who had been a surveyor of reputation in this State. The remainder of the jury consisted of Col. Edward Ward, speaker of the senate of the State legislature; Joseph T. Elliston, mayor of Nashville; Alexander Porter and David Irwin, merchants of the same place; William Easly, member of the legislature from Dickson county; William Phillips, sheriff of that county, and William Douglass, one of the first settlers of the country, from Wilson county. The jury found a verdict for the plaintiff, contrary to the direction of the Court.
On the second trial, Judge Todd sat alone, who observed in substance in his charge to the jury, "This survey of the plaintiff does not place an equal quantity of land on each side of the creek, nor on each side of the line drawn to the west from the beginning, one mile called for, above the spring on the creek, but the survey begins at that point, and runs west, then north, c., to the cardinal points, and by this means a much greater quantity of land is thrown on the north side of the small creek than is on the south, and thus the survey is made to encroach on Donnelson's grant. Were it not for what is alleged by the plaintiff's counsel, I should think this survey not correct; but he insists that it has been the general usage, acquiesced in ever since surveys began to be made in this country under the laws of North Carolina, to make them as this survey has been made, and that it never has been deemed necessary, when a creek or other object has been called for, to include it in the centre, provided it be included in any part of the survey, when its inclusion has been called for. If this practice has prevailed in the manner the plaintiff's counsel contend for, it is a contemporaneous construction of the law, and ought not now to be disturbed; of this the jury will determine, and give their verdict accordingly." The jury retired and in a few minutes found a verdict for the plaintiff; exrelatione Mr. Haywood.
The latter jury consisted of John C. McLemore, surveyor-general of the first surveyor's district, and resident in Nashville; Maj. Abraham Maury, late member of the legislature from Williamson county, and surveyor under the late Col. William Christmass, surveyor of the military lands under North Carolina, and lastly surveyor-general of the first district in Tennessee; George Perry, Charles Hays, Col. Philip Pipkin, George M. Deaderick, president of the Nashville Bank, William Tait, and Robert Hewett, Esquires, of Davidson, and early settlers in the country; Edmond Cooper, Esq., and John Johnson, also of Davidson; George Smith of Sumner, son of Gen. Daniel Smith, surveyor of the pre-emption claims from the year 1783, and one of the first settlers, and Col. Michael Morton of Dickson county.
Both of these juries found verdicts in favor of the plaintiff, and thus the case went off, no further attempt having been made to obtain a new trial. These observations are made with deference to the Federal Court, and with a belief that the reference made by Judge Todd to theusage and practice of the country warranted the insertion of the names of the jurors who sat on the two trials.
Upon examination, it would appear that the usage orpractice, spoken of by the judge, is clearly conformable to the will of the legislature of North Carolina, as will appear from the two great pillars on which the land system rests; viz., the Acts of November, 1777, c. 1; 1783, c. 2, with the acts in addition to, explanatory and amendatory of those two acts, which comprise all the land laws of North Carolina.
The time at, and main purposes for, which these two acts were passed furnish a' clew to unravel the meaning of their most important provisions. As to the first, the State had just thrown aside the colonial government, under which no such thing as entries were required, and consequently her previous habits respecting the appropriation of vacant land would not lead us to suppose that this notice in first entries of their boundaries was contemplated. Besides, there is evidence, in the subsequent conduct of the State, that it was not thought necessary under a branch of the law from which innumerable grants proceeded.
Removed warrants are meant; the laws authorizing such removals did not require any entry at all, and consequently did not contemplate any notice of appropriation to be of record previously to issuing of the grant, which was recorded in the secretary's office of North Carolina, but not registered in the county where the land lay for perhaps half a century, as the time for registration was always kept open. Is it to be believed that if the legislature of North Carolina intended by its Acts of 1777 and 1783 that entries should contain notice or specialty as to boundary, that it would have dispensed with so essential a part of the system when removals were authorized? It would seem not.
The Act of 1777 was passed at the commencement of an arduous and perilous struggle. Money was wanting to carry on the war, and the State placed its greatest reliance on the sale of her vacant lands to raise funds, of which she was in immediate want, as well as to procure settlers, particularly on the frontiers.
In relation to the second, or Act of 1783, it was passed immediately after the conclusion of the war of the Revolution, for the express purpose of raising funds to discharge the war debt. This accounts for the frame of these laws, affording every possible encouragement to first enterers or purchasers of the State, by imposing few restraints in the mode of acquiring titles, and using many precautions to prevent embarrassment of those titles by interferences. In this way the State expected to encourage purchases or entries of land, thereby to acquire fund and settlers within some short time.
In the Act of 1777, instead of the State telling purchasers or enterers that they must enter their lands with so much caution that others coining after them to enter might know how to enter without interference (thus creating metes and bounds to entries), which certainly would have been done, had it been designed, it uses this language to its citizens, that a purchaser shall produce to the entry taker a location (intended as a direction to the surveyor) "setting forth the nearest watercourses and remarkable places, and such watercourses, lakes, or ponds as may be therein, the natural boundaries or lines of any other person or persons, if any, which divide it from other lands." These locations were to be entered in a book by the entry taker, and then they were called entries. Surveyors weredirected "to survey entries in turn, the oldest being first surveyed," 1779, c. 6, § 6; and again in 1783, c. 2, § 19, "the surveyor shall proceed in his surveys, according to the number and date of the respective entries." Surveyors are further told, "to bound their surveys on natural boundaries, or right lines, running east, west, north, and south, and shall be an exact square or oblong, the length not exceeding double the breadth, unless where such lines interfere withlands already granted or surveyed." In the Act of October, 1779, c. 4, § 7, the legislature speaks of surveyors "being prevented from running out entries agreeably to the directions of the Act of 1777, c. 1, "by the boundaries of any land heretofore run out." In contemplation of law, then, previous entries are supposed to be surveyed, and hence, in the same view, it is evident all interferences are supposed to be avoided.
The land laws of North Carolina are replete with ideas and expressions showing the disposition of the legislature, that the oldest enterer should not only obtain the first survey, but the first grant.
Why this disposition, and even solicitude, evidenced by these several acts of the legislature, that the first enterer should have his right first perfected, and free from embarrassment, if the elder enterer would stand in no better situation as to the security of his claim than if he should obtain a survey and grant after subsequent interfering claimants? He could not stand in a better situation in relation to subsequent enterers, if his entry either expressly, constructively, or by implication, was by law designed to contain precision or certainty as to boundary. If the boundaries of a man's entry are fixed when the entry is made, it is perfectly unimportant to him, as to the security of his right, whether the survey be made and grant obtained before or after a subsequent enterer. The boundary being fixed by the entry, remains the same, whether the survey and grant be first or last.
The regulations of North Carolina respecting caveats, to be found in the same laws; are illustrative of the position that entries were not expected to contain specialty in relation to boundary. The first and most important feature in this part of the land law is, thatcaveats were required to be instituted within three months after entry, and before a survey should take place on either of the interfering claims.[2c]
Hence it resulted, as we know was the fact in practice, that the finding of the jury on caveats was either general or special. They first determined simply who had the right to the first survey, which the surveyor proceeded to execute, as in other cases, bounding the inferior claim on the lines of the first survey, if the inferior claimant was entitled to any land at the place.
A special finding was bounded on conditional or agreed lines, or divisional lines between the improvements of occupants, if contiguous. In this special finding the courses and distances of the person entitled to the survey were always pointed out by the jury as a direction to the surveyor; not so in the first case, but a general finding for the plaintiff or defendant, which always took place when disputes arose out of entries of general description. The different books of entries, previously to 1806, will show that at least nine-tenths of the entries were of this description. Acaveat was usually a contest between two entries, and not between two surveys. April, 1779, c. 5, § 6; 1783, c. 2, § 21. The object of the contest was to determine who had a right to the first survey of the land in dispute.
Now it would seem that if entries of general description were intended to be fixed by implication as to boundary, juries would have been asked on the trial of caveats to fix those boundaries; but no instance is believed to have taken place where they were asked to do this except in the cases alluded to. If the specialty, either express or implied, contended for, being applicable to every entry, was designed by the legislature, it surely would never have thought of a general finding at all. The law would of course have been differently framed, requiring the contending claims to be surveyed before instituting the caveat, as in Virginia and Kentucky; nor is it probable, if surveys before caveats were required to be made, that in such a state of things general verdicts oncaveats, finding simply for plaintiff or defendant, would have obtained in practice. See, as to general and special finding oncaveats, Acts of November, 1777, c. 1, § 6; Ap. 1778, c. 3, § 7; Ap. 1779, c. 6, § 6; October, 1779, c. 4, § 7.
But there is a conclusive reason that the legislature of North Carolina never designed that entries should, as a matter of obligation either expressly or impliedly, be specific as to boundary. In the six years which elapsed from the year 1777 to 1783, the land law was in force; entries and surveys in abundance were made. Entries of general description, and surveys, governed by no other than statutory restraints, were generally practised and acquiesced in. Under these circumstances, it is not possible to believe that if the legislature of North Carolina designed that entries should designate boundaries, it would not have used some language in the Act of 1783 requiring this precision in entries. Instead of doing so, the provisions of the Act of 1777 are re-enacted in hæc verba in 1783. No such precision was required in the Act of 1777; the practice of the country from 1777 to 1783 showed that it was not considered as required, and the re-enactment of the same provisions, without any alteration, demonstrates unequivocally the sense of the legislature on the subject.
Independently of the acts of the legislature of North Carolina, we find that the legislature of this State has clearly expressed its opinion on the subject. By the Act of Tennessee, 1806, c. 1, § 10, entries are put on the footing contemplated by the laws of Virginia and Kentucky. The words of the section are, "that the party shall direct the location thereof so specially and precisely, beginning on one of the lines of the section, or some part of the existing claims within the same, and therein expressing the number of perches the first line shall extend, so that the surveyor may be enabled to lay the same down with precision, before the survey of the same is actually made, which the surveyor is hereby required to place in its proper place without delay, that the vacant residuum may appear within each section in his district."
This section was repealed in the year following, 1807, c. 2, and by § 40 of the same act the North Carolina principle is restored, in the very words of the Act of Nov., 1777, c. 1, §§ 5, 10; 1783, c. 2, § 11.
[2c] This part of the land law is altered by an act of the Tennessee legislature in the year 1807, and caveats are now to he instituted after survey.
[EDITORS' NOTE: THE MARKER FOR FOOTNOTE 2c IS OMITTED FROM THE OFFICIAL COPY OF THIS DOCUMENT, THEREFORE THE MARKER IS NOT DISPLAYED IN THE ONLINE VERSION.]
[1] See Brackenridge's Law Miscellany, 54; Bosw. Life of Johns, vol. 2, pp. 46, 85; Becaria, Treatise on Crimes and Punishments; M'Kean, J., 2 Dall. 98.
[1] See also on this point laws of North Carolina, 1796, c. 7, Pream. and § 1.
[1] See the able argument of Lord Camden, Hindson v. Kersey, 1 Day, 81, m. n.
[2] 3 Wil. ed. Bac. Ab. tit. Grants 1, 6, p. 400; 3 P. Wm. 184, n.; 2 Burr. 1073; Co. Lit. 373 a, 6 b; 3 Rep. 59; Plow. 307; Fin. Law; 10 Max. 53; Co. Lit. 273 a.
[1] Cooke, 31, per White, Campbell, and Williams, JJ.