BAKER ET AL. *vs.* THE HEIRS OF CHASTANG.

1. The plaintiff in ejectment may declare for the whole, or entire interest, and recover a less interest.

2. The death of one of several lessors of the plaintiff, after the commencement of the suit, does not destroy the right of action of the survivors, or abate the suit.

3. Married women are not embraced by the statute of wills of 1806, (Clay's Dig. 596, § 1,) and could not, by virtue of that statute, make a valid devise of their real estate.

4. Although the will of a married woman be admitted to probate in the Orphans' Court, yet such probate is not conclusive upon her right to devise her real estate, and the heir, upon ejectment brought to recover the land attempted to be devised, may call in question the legal effect of the will as a muniment of title, and show that it was ineffectual to pass the estate, no power to make such will having been reserved to, or acquired by the testatrix.

5. A party out of possession of land, which has been held adversely for more than thirty years, and after two descents cast upon such adverse claimants, loses not only his right of entry upon the same, but all right to recover it by any real action.

6. A party in possession of land, who has held in subordination to a title which has been perfected by reason of the adverse possession of himself and those from whom he claims to have derived it, and which adverse possession has operated a complete bar to an outstanding title, cannot defeat a recovery upon the title under which he has held, by purchasing in the barred claim and giving it vitality by substracting the time he has held under the title adverse to it. If the outstanding title was barred and impotent as a defence, at the time of the purchase, its acquisition by the defendant in possession gave it no vitality.

7. Where a husband, entitled to a lot of land in the city of Mobile, under a grant from the Spanish authorities, died in possession, leaving no kindred, when that city was under the dominion of Spain, his wife succeeded to the estate by the law then in force; (2 Partidas, 1101; Partida 6, tit. 13, L. 6;) and if, upon the application of the widow to the proper commissioner of land claims for confirmation of title, the evidence of which was lost by time, or destroyed by accident, the Government of the United States, after the acquisition of said territory, actually confirm her title upon the recommendation of such commissioner, such confirmation enures to her benefit, and operates as an acknowledgment, on the part of the government, that the title had already vested in her by virtue of the previous grant to her husband.

8. The survey and location of the land, under the act of Congress, after the death of the widow, to whom it had been confirmed, did not defeat the confirmation, but was cumulative evidence of title enuring to the benefit of her heirs.

ERROR to the Circuit Court of Mobile. Tried before the Hon. John Bragg.

THIS was an action of ejectment, instituted by the defendant against the plaintiffs in error, to recover a lot and improvements in the city of Mobile. The lessors of the plaintiff below, as shown by the bill of exceptions, are the children of Eugene Chastang, deceased, who was a brother of Mrs. Elizabeth Gannard, formerly Elizabeth Chastang, under whom they claimed the premises in controversy as her heirs at law, she having died without issue. It appears that Joseph Chastang, the father of Mrs. Gannard, died many years ago, leaving other children besides the said Elizabeth and the said Eugene, none of whom are made parties to this suit; and it further appears that after the institution of the suit, two of the lessors of the plaintiff died, but the parties went to trial without their death being in any way noticed. The plaintiff, to show title in Mrs. Gannard, proved that in 1802, she and her then husband, Rafael Hidalgo, lived on the lot, in a house which he had erected, and continued thus to live until 1811, when Hidalgo died, leaving no kindred in this country; that after his death, she retained possession of the premises, and filed a claim to the lot with the United States commissioner of land claims east of Pearl river, which claim was founded on a Spanish grant, (lost by time or accident,) to the said Joseph Chastang, and on a deed dated in 1797, from said Joseph to her late husband, Rafael Hidalgo. This claim was confirmed by act of Congress of the 8th May, 1822. It was further proved, that in 1813 or 1814, she married Michael Perrault, and they occupied the premises until 1818 or 1819, when he died; that shortly after his death, she married Victor Gannard, with whom she lived on said premises until 1822 or 1823, when they removed to another lot on Royal street, where she died, without issue, on the 10th or 11th of Feb. 1824; and that after their removal from the premises, Gannard, her husband, was in possession of them by his tenants, until 1835, when he sold and conveyed the lot with warranty to Eslava,

from whom it passed through intermediate titles to Beaugerand, under whom the defendants below claim. It was shown that since the sale by Gannard, possession has followed each conveyance.

The defendants introduced in evidence:

1st. The deed from Joseph Chastang to Hidalgo, dated in 1797.

2d. A deed from Hidalgo to Registe Bernody, dated in 1810, and which contains a clause of mortgage from the vendee to the vendor to secure the payment of $3,400, the amount of the purchase money.

3d. A deed from Mrs. Gannard, then Mrs. Hidalgo, to the said Bernody for another lot, dated in 1812, in which the lot therein conveyed is described as bounded on one side by a lot the property of Bernody.

4th. A deed from Pierre Registe Bernody, the son and sole heir at law of Registe Bernody, to Eslava, dated in 1846. All these deeds, except the third, were for the lot in controversy. There was no evidence that Registe Bernody was ever in possession or set up any claim to the lot. The defendants laso introduced in evidence a transcript from the records of the Orphans' Court of Mobile county of a will executed by Mrs. Gannard and admitted to probate, wherein she devised the lot in controversy to her husband, Victor Gannard; a deed from Mrs. Gannard to one Griffin, dated the 10th Feb. 1824, but which was never acknowledged by her, and was admitted to record on the oath of a subscribing witness; and a deed from said Griffin to Victor Gannard.

The court charged the jury—

1. That if Mrs. Gannard was a married woman at the time she made that will, that it is void, as a married woman could not devise.

2. That the probate of the will was evidence only of the genuineness of the paper, and did not operate, so far as to forestall the inquiry as to the capacity of the wife to devise; that her power to devise, if she was married when she made the will, was still an open question before the jury, and this, notwithstanding the lapse of time since the probate.

3. That the claim made by Mrs. Gannard in the land office, and the confirmation which the act of Congress of the 8th May,

1822, gave, was a sufficient title to her, and that it descended to her heirs.

4. That the title of Bernody, to avail the defendant, must have been a valid and subsisting title when Eslava acquired it; that if Mrs. Gannard and those claiming title under her, namely, Victor Gannard, Eslava and others, had possession under their respective deeds, prior to the date of the deed from Bernody to Eslava, in 1846, for more than twenty years, without interruption from Bernody, then his title was barred by the statute of limitations, and it could not avail the defendants in this defence.

5. That the death of two of the lessors of the plaintiff, since the commencement of this suit, would not prevent the recovery in this action by the surviving plaintiffs, of their proportion of the land; that notwithstanding there might be other brothers and sisters of Mrs. Gannard, who were co-heirs with the lessors of the plaintiffs, and equally entitled with them, and who were not joined in this suit, still this would not defeat the plaintiff's right to recover for the portion of the land to which they might be entitled; that although they had declared for the whole, they might recover less than the whole.

6. That unless the defendants, or those under whom they claim, had had adverse possession for twenty years before this suit was brought, the action was not barred, and that the act of 1843 had no influence on the case.

The defendants prayed the court to give the following charges to the jury:

1. That the claim and confirmation in the land office, being made in right of her husband, (Hidalgo,) had not the effect to vest her with a title in her sole and individual right.

2. That if Mrs. Hidalgo had possession after the death of Hidalgo, merely, and without title, that upon her subsequent marriage, she could not be considered as continuing her sole possession, and that the occupation by herself and husband, if she had no title, would be considered as the possession of the husband, whereby the possession of the defendants would exceed twenty years. This proposition the court admitted, but instructed the jury that the claim and confirmation to her by the United States would constitute such title, as would relate back and entitle them to consider the possession as belonging to her under that title.

3. The court was further asked to charge, that if Hidalgo had conveyed to Bernody, and continued in possession after such conveyance, the law would presume that the possession was held for and under him. This the court charged, but also told the jury, that the making her claim in the land office by Mrs. Hidalgo was sufficient evidence to render her possession adverse from that time, and would defeat such presumption.

4. That no part of the time since 1824, when V. Gannard and those claiming under him were in possession, could be computed as a part of the time to bar the outstanding title of Bernody. This charge the court denied, and in lieu thereof instructed the jury that if Bernody had not been in possession of the property within twenty years next before the year 1846, when he conveyed to Eslava, that his title was barred, and could not for that cause aid the defence of the defendants.

The defendants below having duly excepted to the refusals of the Circuit Court to charge, as well as to the charges given, now assign for error—

1. That the declaration is for the entirety, and the verdict and judgment are for one undivided third only; and,

2. The ruling of the court, as above set forth by the bill of exceptions.

STEWART & HAMILTON, for the plaintiffs in error.

CAMPBELL, for the defendants.

CHILTON, J.—This case has been elaborately argued, and we have examined with care the numerous authorities, to which we are refered by the respective counsel.

As some of the points raised have been ably discussed in the decisions, to which reference is made, we shall content ourselves with merely stating, as succinctly as we can, our conclusion upon them, without entering at large into their discussion, but there are other points of more difficulty, and which will require a more elaborate investigation. 1. It is well settled that the plaintiff in ejectment may declare for the whole, or the entire interest, and recover a less interest.—McArthur v. Porter, 6 Pet. 205; Adams on Ejec. 211, and cases cited in notes; 12 Wend. 170; 13 ib. 578; 8 Dana, 196.

2. Neither, in our opinion, does the death of a portion of the lessors of the plaintiff, since the commencement of the suit, de-

stroy the right of action of the survivors, or abate the suit.—Adams on Ejec. 320 ; Jackson *ex dem.* Austin v. Kimber et al., 1 Wend. 27 ; Friar et al. v. Jackson *ex dem.* Van Allen, 8 Johns. 495 ; Doe *ex dem.* Marston v. Butler, 3 Wend. 153 ; Robertson v. Morgan, 2 Bibb, 148 ; Duncan & Wife v. Forsythe, 3 Dana, 230. It does not appear by the record, but that those who survived were entitled, as the sole heirs at law, to the interest of the deceased parties. " The general rule to be observed in such cases is, that wherever the death of any party happens pending the writ, and yet the plea is in the same condition, as if such party were living, then such death makes no alteration ; for, where the death of the party makes no change in the proceedings, it would be unreasonable that the surviving parties should make any alteration in the writ, for, if such writ and process were changed, it would set rights but in the same condition they were in at the death of the parties, and it would be absurd that what made no alteration should change the writ and the process, and on this will all the diversities turn."—1 Bac. Abr. Tit. Abatement, *f.* It is said, that after verdict, the bare possibility of title consistent with the judgment is sufficient.—Bac. Abr. (Bouv. ed.) vol. 3, p. 292, Eject. *f.*

3. The Circuit Court held that, as a married woman had not the power to devise her real estate, the will of Mrs. Gannard in this case did not have the effect of passing the title, so as to prevent her heirs from succeeding to the inheritance. This has been the point mainly controverted in the cause.

The question presented is one of novel impression in this court, and we have looked into the authorities with care, to ascertain what construction should be placed upon our statute of wills, (Clay's Dig. 596, § 1,) which is general in its terms, making no mention of married women, either as enabling them to devise, or as denying to them the power. Our statute is similar to the 32 Hen. VIII, *c.* 1, which enacted that " all and every person and persons, having, &c., shall have power to give, dispose, will and devise, &c."—Thus it was left, under the English statute, to the courts to determine who were embraced in this general language, and it was held, that while married women were embraced by the letter of the statute, still they did not come within its spirit and meaning ; that the equity of the law corrected these general expressions, and restrained them to

comprehend only such persons, as by law could dispose of their real estate by other modes of conveyance, previous to the passage of the act.—See Powell on Dev. 126, citing Dyer, 345, and 1 Ves. Sr., 500. To remove all difficulty on this head, the Parliament, two years thereafter, passed the explanatory statute of 34 Henry VIII, *c.* 5, § 14, declaring the wills of *femes covert*, persons within the age of 21 years, idots, and persons of nonsane memory, made of lands, &c., to be invalid.—1 Jar. Wills, 28.

The construction which was placed by the English Courts upon the first statute of wills, seems generally to have been followed by the American Courts, in the several States whose statutes are similarly worded, and the better opinion seems to be that a married woman cannot make a valid will of lands, even with the consent of her husband, and without any statute prohibition to that effect.—Marston v. Norton, 5 N. Hamp. Rep. 205; West v. West, 10 S. & Rawle, 445; Osgood v. Breed, 12 Mass. Rep. 225; 4 Kent's Com. 505; note *a.* (6 ed.); in the matter of Yates' Will, 2 Dana, 215; S. Touchstone, 402; Kelly's Devisees v. Kelly, 5 B. Monr. 370; 1 Wms. on Exr's, 42, note 1, (Amer. ed.;) West v. West et al., 10 S. & Rawle, 445, and cases cited.

The contrary doctrine of Judge Reeves, in his work on the Domestic Relations, page 157, cannot be supported. The argument which deduces the power to make a valid devise from the right which a married woman possessed of conveying her estate by the consent of her husband, we do not think can be sustained. By the common law, no one could devise his lands, it then required a statute to confer the power; the statute of 22 Henry VIII, confered it as we have said, in general terms—nothing is said as to married women, but the statute was construed not to extend to them. She could *then* by the common law have passed her title by fine.—McQueen on Hus. & Wife, 144-5-6. This form of transmitting title was succeeded by a conveyance by the wife, with the assent of the husband, the deed, however, being of no validity as against her until it was ascertained (according to the forms which the law required at the time the will now under consideration was executed,) upon her private examination, that she executed it freely and voluntarily, and thus she was guarded by the proper officers of the law against the undue exercise of the husband's authority.

. By the marriage, the ownership of the land of the wife was vested in the husband during their joint lines; he had a freehold interest, they both being seized together in her right by entireties, during the coverture. He could sell the land at pleasure, without the co-operation of the wife. So he could charge the land of the wife during their joint lives, the charge ceasing and the sale being ineffectual at the termination of the coverture. The fee resided in the wife, and could only be divested by the joint act of both her and her husband, by reason of the disability of her coverture, (McQueen, 1 Hus. & W., 27,) and upon her private examination. She then really had not the power to dispose of the land, *but she and her husband*, and not both of them, but by the act of the court or officer, in effecting the examination. We feel fully satisfied that the power to devise, as derived from the statute, did not pertain to the wife. Neither, in the case before us, is it pretended that the wife united with, or consented to the former husband's conveyance of her land, unless indeed we infer a recognition of it from the deed which she executed to Registe Bernody for another tract, in which it is recited, that the lot sold is "bounded on one side by another lot belonging to the said Bernody." The counsel say that the lot refered to, as the boundary line, is the one in controversy in this suit; but the record, to which alone we can look, does not sustain this position, and the party excepting should have made the matter plain, if the fact had so existed. But we will not say that we are prepared to hold that had she expressly recognised in this manner his title, it would have amounted to a divestiture of her interest. The facts of the case, however, call for no opinion on this point, and hence we express none.

4. But it is insisted by the plaintiffs in error that the will of Mrs. Gannard having been duly admitted to probate in the Orphans' Court of Mobile, such probate is conclusive of the validity of the will to pass the title, and of her capacity to devise, and that the same cannot be collaterally impeached. It is certainly true that the validity of a will, duly admitted to probate, cannot be collaterally impeached; but this is not the question before us. The object of Mrs. Gannard's heirs is not to impeach her will, but to show that the land in controversy did not pass by it. They deny its effect in law as passing title to the land, by reason of her legal incapacity to devise. The effect then of a probated

Baker et al. v. The Heirs of Chastang.

will, as a muniment of title to real estate, is the true question at issue, the plaintiffs in error insisting that it passes the title, the defendants, on the contrary, contending that it is impotent in that behalf.

Before a will of personal property takes effect in England, it must be proved in the Spiritual Court, and the Chancery Court will not take jurisdiction of it, until after probate. In Henley v. Philips, Lord Hardwicke is reported to have said, that though a *feme covert* has power of disposing of a sum of money, or other thing, by a writing purporting to be a will, yet after the wife's death, the proving it in the Spiritual Court will not give it the authority of a will, but it will still be considered as an instrument only, or an appointment of such sum, or other thing, in pursuance of the power.—2 Atk. Rep. 49; see, also, 4 Burns Ecc. Law, 53, where the rule is stated to be, to grant the probate of such will in the Prerogative Court, and to try the question at law, whether the husband has confered upon the wife the power to make such will. In the Goods of Sarah Biggar, 2 Curtis' Ecc. Rep. 336, the question arose upon the probate of a will of a married woman, under a power reserved by marriage settlement, whether it had been duly executed according to the power. The court say, "formerly, in such cases, this court left it to a court of equity to say whether the power was duly executed or not; but it has been held lately, that this court is bound to give its opinion in the first instance, as to the validity of the execution. It is really a question for a court of equity. The safest way will be to allow probate to pass, leaving the question, as to the execution of the power, open; it is clear a court of equity cannot act, unless the court of probate allows probate to pass."—See also, 1 Phillimore, 352; 3 Adams, 235. Notwithstanding the exclusive jurisdiction of the Ecclesiastical Courts over the probate of wills of personal estate, yet it is the constant practice for courts of equity, as to wills of married women, to enquire whether they amount to a good execution of the power vested in them. So in Watt v. Watt, 3 Ves. 244-6, the Lord Chancellor said, "the claim of the husband derives no aid from the probate he has obtained, for the Ecclesiastical Court had no jurisdiction to determine whether an instrument is a good execution of a power."—See also, Stephens v. Bagwell, 15 Ves. 140-54-5. In a recent case, it was said by Sir John Leach,

Master of the Rolls, "the instrument here must be taken to be a valid testamentary paper, and the only office of this court was to see *that it had been duly executed, and attested according to the power*." He held that the court of chancery could not question the instrument as a will, it having passed probate in the Spiritual Court, but it could investigate and decide the question, *whether it was executed according to the formalities prescribed by the power*."—Douglas v. Cooper, 3 M. & Keene, 378.

The same doctrine appears to have been recognised by many of the American courts, in States, whose courts of probate have jurisdiction over the subject of proving wills, &c., commensurate with our own. Thus, in Yates's Will, 2 Dana's Rep. 215, the court, after admitting that there were well established exceptions to the general rule, which denied to married women the power to make wills, and that before such will could properly be admitted to probate, the propounder of it must show, at least, a *prima facie* case to authorise it, such as, that she was executrix, had a separate estate, or power to appoint by will, say, that it is sufficient that the County Court sees that there exists a state of case, in which it might be right and proper that a married woman should make a will, to allow it to be proved and recorded, leaving it to other and more appropriate tribunals to determine what effect it has when recorded; and the court cites Wms. on Exr's. 42 and 211, to show that although the instrument creating the power must be exhibited by the executor with his allegation, yet the Ecclesiastical Court will not look nicely into the question whether the appointment is authorised by the power, as the grant of the probate does not determine that right, but leaves it open to the decision of the temporal courts.

In Kelly's Devisees v. Kelly, 5 B. Monr. 369-70, the court say—"How far the power, if it exists, may have been pursued or exceeded, or how far the will may be available, as a disposition of property under the power, are ulterior questions, not necessarily nor properly presented for decision in the court of probate." So, also, in Johnson's Trustees v. Yates's Devisees, 9 Dana, 491, some of the devises in the will were held to be inoperative, after the will had been admitted to probate, because they exceeded the power of the testatrix.

In Holman v. Perry and others, 4 Metc. Rep. 492, the court, after stating the law to be, that to make a devise by a married

Baker et al. v. The Heirs of Chastang.

woman of land, available to the devisees, it must have its foundation in, and acquire its efficacy from some special power, retained or acquired by her, to make a testamentary disposition of the estate, proceed to show how the power must be pursued; but they hold that where such will contains any property on which it can operate, although there may be devises in it which cannot take effect, still it is the duty of the probate court to allow it to be proved. "The probate of a will," says Dewey, J., delivering the opinion of the court, "does not necessarily settle any question of title to real estate, arising under the same; it establishes the due execution of the same by the testator and is conclusive thus far, but as to his title, or his right to devise the property named in the will, it binds no body who has any adverse interest; questions of that character are to be settled by proper proceedings at law, or in equity." This doctrine, in respect to wills of married women, does not trench upon the rule, as generally laid down by the courts, and by none more stringently than the court of Massachusetts, whose probate courts, like ours, have complete jurisdiction over the probate of wills of real, as well as personal estate, that the decrees of such courts are conclusive upon all parties, and cannot be collaterally called in question.—See cases cited in 1 Jarm. on Wills, 23, and note.

The case of Herbert v. Hanrick, 16 Ala. 581, involved the question whether a stranger, in a collateral proceeding, could take advantage of a supposed irregularity in the probate of the will, the same appearing to have been proved by one witness, though regularly attested by three. We held that he could not thus impeach it, and that the Orphans' Court having rightful jurisdiction, its action in the matter of the probate was final and conclusive upon all persons, until it was directly impeached, as provided by law. That was not the will of a married woman, but of a party capable *prima facie* of devising. Besides, the question had relation to the execution of the will, and did not involve the execution of a power. It is, we think, very clear, that while that decision is correct, it does not in the slightest degree militate against the view we here take.

We concede however, that several of the decisions cited by the counsel for the plaintiffs in error would seem to hold the probate in this case conclusive upon the heir as passing the title.

The case in 5 Mason's Rep. 332, is opposed to our conclusion. It was there held by Mr. Justice Story that the grant of administration, with the will annexed, of the wife's estate, by a court of probate, was conclusive to establish her right to make the will, because the general jurisdiction which the probate court possessed included the right to inquire into the fact, whether she might well make it. This learned judge in that case said, "that the decision of the probate court, being a court, not only of competent, but exclusive jurisdiction, establishing the will, and granting administration with the will annexed, is conclusive upon the point now in controversy, and cannot be gainsaid." One of the grounds taken by the defendant in that case was, that the wife, under whose will the administrator claimed the demand sued for, had not authority to make it, and this was one of the points which was considered concluded by the probate. We must, however, be allowed to say that this profound jurist does not appear to have given that point in the case a very mature consideration; and besides, it was not necessarily involved, for he admitted, that although the decree of the probate court upon the subject of the will might be erroneous, still the grant of administration would entitle the complainant to relief. We have examined the several cases to which we have been refered by the counsel, besides some others, bearing upon this question, and without swelling this opinion to too great a length by a particular notice of them, we have, after mature deliberation, come to the conclusion that the probate in this case is not conclusive upon the wife's right to devise her lands, and that when it is shown that she possessed no such power, the devise could not be effectual to pass the estate. We have shown that generally married women cannot devise, except under certain powers, reserved to, or acquired by them, and when it is manifest that the will, which is set up as a muniment of title, was not made by a *feme covert* under such circumstances as that the law will recognise her right to devise, it must be held inoperative, notwithstanding the probate. To hold the decisions of the Orphans' Court conclusive in such cases, would be to devolve upon it the most abstruse and perplexing questions, which can arise in the law, and upon which, in many cases, there would be no means of revising its decisions, for if the will is valid as to a portion of the devises, it must be admitted to probate, and upon an issue *de-*

*visavit vel non* out of chancery, as our statute prescribes, the jury would have to pronounce in favor of such will, although it might be invalid as to a part of the bequests or devises. It is not imperative upon the court to grant in such cases a qualified probate, but this is done as a matter of caution. It may grant a general probate, and the question, as to the due execution of the power, will still remain open, as is shown by the cases already cited. We do not think it was intended by the framers of our statute to make the decree, allowing the will of a married woman to be proved, final and conclusive upon the title to lands, which, as a *feme covert*, she had no right to convey. The English doctrine upon the subject, we regard as correct, and since it has been followed by numerous decisions in other States, we are disposed to adopt it here, believing it conforms better to the law, and to the organization of our courts. The probate is conclusive evidence, as to the existence of the will, and as to all questions concerning its valid execution as a will, arising from mental incapacity and the like, on the part of the testatrix, but it is not conclusive upon the question, whether the testatrix could in this mode pass title to real estate. It is conclusive so as to admit the will in evidence, and forestalls all inquiry as to whether it was her will, but it is not conclusive as to the legal operation of such will, as translative of title to the real estate embraced in it. This, we think, is the true distinction, and as it substantially agrees with the charge of the Circuit Court in respect to the will, there was no error in that charge.

5. But it is further insisted, on the part of the plaintiffs in error, that no such title was shown in the plaintiffs below as will enable them to maintain this action, and their title is assailed upon two grounds: First, it is said the title was in Hidalgo, who sold to Registe Bernody, whose heir sold to Eslava, who is the vendor with warranty of the landlord of defendants below, and that they are protected by this title. Second, that the confirmation of the claim of Mrs. Hidalgo operated, if it vested any title, an investiture of title in her husband, and enured to the benefit of his vendee or heirs, she having died after such confirmation, but before the land was surveyed, and having exhibited her claim to the land commissioner as the widow of Hidalgo, claiming to hold as such. Let us briefly examine these positions.

It appears that, in 1810, Hidalgo, who had purchased the lot from Joseph Chastang in 1797, executed a deed to Registe Bernody for the same, which contained a condition of mortgage back to Hidalgo, to secure the payment of the purchase money, amounting to $3,400. Hidalgo, the mortgagee, retained the possession and died in 1811, without kindred in this country, his widow remaining in possession, and retaining his property after his death; after the change of flag, in 1813 or 1814, she married Michael Perrault, and they continued in possession until 1818 or 1819, when Perrault died. The widow shortly afterwards married Victor Gannard, and they jointly occupied the premises until 1822 or 1823, when they removed to another house in the city of Mobile, where she died on the 10th or 11th Feb. 1824. At the time of her death, Gannard had the place in possession of a tenant, and continued to rent it out until 1835, when he sold and conveyed it with covenants of warranty to Eslava, through whom defendants below claim title. So it appears that both Hidalgo and Mrs. Gannard died in possession of the premises. Here was a possession retained under Hidalgo's title, or in subserviency to it, from 1797 to 1846, when Eslava acquired a release to himself of Bernody's claim. A period of thirty-six or seven years elapsed with Bernody out of the possession, (indeed, he never had possession,) two descents cast,—one upon the death of Hidalgo, the other upon the death of Mrs. Gannard,—and during all this period, there was no assertion of right or pretence of claim set up to the premises under the deed from Hidalgo to Bernody, either by Bernody himself or those claiming under him. In the mean time, Mrs. Hidalgo presented her claim before the land commissioner, as heir of her husband. which claim, as we have said, having been favorably reported on, was confirmed by act of Congress, in 1822, Bernody, the while, making no claim to the premises, notwithstanding the act of 25th April, 1812, required the commissioner, for the more convenient ascertainment of claims, to attend in the several parishes, for the purpose of receiving notices and evidences of titles and claims to lands within the same, giving at least twenty days' public notice before the commencement of his investigations, and notwithstanding the same act declared that " if such person shall neglect to deliver such notice in writing of his claim, together with the

plat, (if the land claimed shall have been surveyed,) as aforesaid, or cause to be recorded such written evidence of the same, within the time and times as aforesaid, his claim shall never after be recognised, or confirmed by the United States, nor shall any grant, order of survey, deed, conveyance, or other written evidence, which shall not be recorded, as above directed, ever after be considered or admitted as evidence in any court of the United States against any grant, which may hereafter be derived from the United States." The previous portion of the section of this act prescribes that the persons, having deeds, grants, &c., shall deliver them to the commissioner for the purpose of having them recorded. The time, within which this was to be done, was limited to six months, but was enlarged by several subsequent statutes.—See 2 United States Statutes at Large, 714-15. The Spanish record, from which the defendants below read the deeds from Joseph Chastang to Hidalgo, and from Hidalgo to Bernody, do not appear to contain any evidence, as to the claim of Joseph Chastang,—whether he claimed by grant from the Spanish government, inchoate or complete. So that the necessity for taking steps, on the part of Bernody, had he desired to assert or perfect his title before the commissioner, charged with collating the evidences of such title, is made apparent. He, however, did nothing. Under these circumstances, and after the lapse of so many years, we are very clear in the conclusion, that a right of entry is not confered by Bernody's title, paramount to the right of Mrs. Gannard's heirs, she having, as we have said, died in possession, or which is equivalent thereto, with a tenant in possession, holding under her husband in subordination to her title. The heir of Bernody had not only lost his right of entry by descents cast, and the lapse of a period of twenty years, but he had lost all remedy by any real action, the land having been in the adverse possession of others for more than thirty years.

6. But it is argued that the defendants' vendor having acquired Bernody's title, it cannot be defeated upon the ground of adverse possession, because, deducting the time the defendants, and those under whom they claim, have had possession, the right of entry under the Bernody title would not have been barred; and that to hold it taken away by lapse of time, under the circumstances, would be to invoke the defendants' own pos-

session to make it bar their own title. This argument is plausible, but it cannot be supported. It will not be contended that the title of Bernody acquired any additional potency by the relinquishment of Pierre Registe Bernody to Eslava. He could sell no greater title than he had, and the purchaser could take no more by his deed. If his title, before the sale, was extinguished by the operation of the statute of limitations, neither he, nor any one claiming under him, could set it up to defeat a recovery by those in whose favor the statute operated. In Griffith v. Dicken, 4 Dana's Rep. 559, it was said that an outstanding title can be used as a shield by a defendant in ejectment, only on the ground that it shows that the holder of it has a better right of entry than the plaintiff in the action. So in Jackson v. Hudson, 3 Johns. R. 375-81, by Mr. Ch. J. Kent, that "if a defendant sets up an outstanding title existing in a stranger, it must be a present, subsisting title; it must be one that is subsisting and operative, otherwise the presumption will be, that it has been extinguished."

In Jackson ex dem. Boune v. Hinman, 10 Johns. Rep. 392, it appeared that the lessor of the plaintiff claimed title to the premises, by virtue of a sale under a judgment against one Gideon Brockway, who derived his title from one Camp, who had built upon the premises, and derived his title under what was called the Lindsey patent. The defendant was the tenant of one Livingston, who purchased from said Brockway, after the judgment had created a lien, and entered under that purchase, but, some years thereafter, took a quit claim deed under what was denominated the Catskill patent; and he set up the latter title, as older and better than the plaintiff's; but the Supreme Court held that as Livingston came in under the title from Brockway, he was estopped from denying that title, as against the grantee under the same title. "It cannot be a good title for him, at one time," say the court, "and not a good title at another. He cannot be permitted to gainsay that title, as against a plaintiff, who claims under the same title, by a prior right," &c. In Lessee of Foster v. Joice, 3 Wash. C. C. Rep. 598, Mr. Justice Washington said, that wherever the defendant opposes to the plaintiff's title an outstanding, superior title in a third person, under whom he does not claim, it must be a subsisting and available title, on which the asserted owner of it

might recover in ejectment, if he were the lessor of the plaintiff. See, also, Jackson v. Todd, 6 Johns. R. 265-66; Adams on Eject., by Till., edit. of 1846, p. 32, n. 3.

We think it very clear from these authorities, that the defendants could not have availed themselves of the title, had it been outstanding in Bernody's heir. And we can see no principle of law, upon which we should be justified in holding that the act of transfer of an extinguished title should give it a vitality, an operation, which it did not possess before, as respects the rights of third parties. Did the statute operate only upon the remedy, by which a party who is barred must recover the possession, then there might be something in the proposition that the party in possession, having acquired the barred title, might set it up to defend his possession. But that is not its operation. It not only divests the party of all remedy, but of the right itself, so that a sale of such title to one in possession amounts to nothing, and furnishes no protection. The possession of the defendants, and those through whom they claim, was shown to have been adverse to the claim of Bernody. They derived their claim of title through the will of Mrs. Gannard, and holding in fact in subordination to that title, they cannot by their election change the true character of that possession, and say it was *not adverse* to Bernody. It is among the transactions of the *past*, over which nothing has power. Suppose that Eslava had yielded the possession to Bernody's title, which was barred, and had brought his action upon the covenants in the deed from Gannard to him, (conceding, for the sake of the illustration, that the will of Mrs. Gannard passed her title to him,) would it be contended for a moment that he would have been allowed to deduct the time he has held under Gannard, and thus give the title of Bernody vitality, as against the title under which he held? Certainly not. So neither, when the same title is asserted by the heir, should he be allowed to say that, although he has held under it, yet such possession was not adverse to an antagonist claim. It was either adverse and hostile to the claim of Bernody, or in subservience to it. Certainly it was not the latter, and upon no principle of retrospective relation can it be made so to operate. We conclude, therefore, that the claim of Bernody furnishes no ground of defence to the action, under

the proof disclosed by the bill of exceptions, and that the Circuit Court did not err in its charges concerning it.

7. We come next to consider the second objection to the plaintiff's title—the character of the title of Mrs. Gannard. The title of Hidalgo was predicated upon a Spanish grant, lost by time or destroyed by accident. He died in possession of the land, and without kindred. It was deemed necessary to have a recognition and confirmation of this title, according to the act of Congress, by the United States, and hence Mad. Hidalgo presented her claim, as widow of her late husband, to the commissioner, which, as we have said, was recommended for confirmation, and afterwards confirmed, on the 8th May, 1822, by Congress. The counsel for the plaintiffs in error insists, that she must be considered as asking a confirmation of the title of the true owner, her husband, and that the act of confirmation, if it vested any title, enured to the benefit of Hidalgo's heirs or grantee. But he overlooks the fact that at the time of Hidalgo's death, by the laws then in force, he having no kindred, his wife succeeded to his estate, and his title derived from the Spanish government descended to her. It is laid down in 2 Partidas, 1101—(see Partida 6, title 13, law 6,) as follows—"And we moreover say, that if any one die intestate, leaving neither ascendants, nor descendants in 'the direct line, nor brothers, nor nephews, then his nearest relation in the tenth degree will inherit his whole estate; and if no such relation exist, and the deceased leave a legitimate wife, she will inherit his whole estate." The wife, then, succeeded to the estate, by descent from the husband, and had the right to apply, as she did apply, after the change of flag, for a confirmation of title in herself as Hidalgo's wife. This right the government recognised, and, by the operation of the act of 8th May, 1822, confirmed in her the title, which had previously vested by the Spanish grant in her husband. She then had more than the possession merely. The claim of Bernody aside, she had the legal title to the land, but wanted the evidence of that, the grant being lost or destroyed, and when the government of the United States confirmed her title, it did not confer a title upon her; neither would the subsequent issuing of a patent by the United States effect more than the conveyance to her of whatever

claim the government had to the land, and this was the effect of the confirmation; for by confirming a title which was created by the act of the former sovereign, before the treaty by which the United States acquired the domain, this government acknowledges that it acquired no title to the land, thus previously granted, and which had become private property. In Eslava v. *Doe ex dem.* of the Heirs of Farmer, it was, we think, correctly said, "that the act of confirmation does not only assume, but in fact admits, that the title was not in the United States by the cession, as it admits that the land in question was separated from the public domain before the treaty was made."—7 Ala. 558.

8. Having shown that Mad. Hidalgo succeeded to her husband's title, which title was confirmed in her by the act of 1822, the subsequent survey, &c., which was made after her death, certainly did not operate to change the title out of her and vest it in another. Its effect was more particularly to designate and set apart the land, and to authorise the issuance of a patent. It was but cumulative evidence of title, enuring to the benefit of the person to whom it had previously been confirmed, or to her heirs, she having previously died, and did not operate to vest title in the vendee of Hidalgo; for, to give it this effect, the survey and location would defeat the operation of the confirmation, which adjudged the title to be in Mad. Hidalgo.

It is unnecessary for us to dwell upon the question, whether the possession of Mad. Hidalgo was adverse to that of Bernody. From the time she made the application to the government commissioner for confirmation of her title, or, to speak more accurately, for its recognition, there can be no doubt of the adverse character of her claim. This itself amounted to an open and notorious assertion of a hostile adverse claim; and we think there was no need for invoking the doctrine of relation to render it adverse. So that if the court erred, in charging that the confirmation related back, so as to make her holding adverse, it was in no sense injurious to the plaintiffs in error.

We have shown, in the previous part of this opinion, that Mad. Hidalgo, having the title to the lot by descent from her husband, which title she asserted, as required by the act of Congress, and which has been duly confirmed, her subsequent husbands, having entered and held under her title, obtained no interest in the fee. Upon her death, her will passing no title, the

land descended upon her heirs, and as they commenced this action before their right of entry was barred by the statute of limitations, it follows they had the right to recover. It is unnecessary to apply the views here expressed to the several charges of the court. It is only necessary to say, in conclusion, that those charges substantially conform to them, and that, after the most mature deliberation we have been enabled to give this case, our conclusion is, that there is no error in the record, and the judgment is consequently affirmed.

DARGAN, C. J., having been of counsel, did not sit in this cause.